PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA  92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

SILVIA GARCIA, individually and on behalf of all others similarly situated,

Plaintiff,

v.

LENNAR CORPORATION, a Delaware entity d/b/a WWW.LENNAR.COM,

Defendant.

Case No. 2:23-cv-10298-FMO-DFM

**FIRST AMENDED CLASS ACTION COMPLAINT**

## INTRODUCTION

**Defendant Lennar Corporation ("Defendant") secretly enables and allows a third-party spyware company to wiretap and eavesdrop upon the private conversations of everyone who communicates through the chat feature at lennar.com (the "Website"). The spyware company then exploits and monetizes that data by sharing it with other third parties, who use the private chat data to bombard the unsuspecting visitor with targeted marketing.**

**Defendant does this without visitors' informed consent. As a result, Defendant has violated the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630 *et seq*.**

**In addition, to learn the identity of anonymous visitors to the Website and monetize its knowledge of those visitors and their online habits, Defendant has secretly deployed spyware that accesses visitor devices, installs tracking software, and surveils their browsing habits.**

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(a) because matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and there is complete diversity between the parties. Plaintiff is a California citizen; whereas, Defendant is incorporated in the state of Delaware and has its principal place of business in the state of Florida. Notably, Defendant has filed a Notice of Removal asserting the existence of original jurisdiction. (Doc. 1.) This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is at least minimal diversity because at least one plaintiff and Defendant are citizens of different states. Violations of the CIPA are subject to statutory damages of $5,000 per violation.[1]  (Cal. Penal Code § 637.2(a)(1).)  Thus, if only 1,000

---

[1] "It is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."  (Cal. Penal Code § 637.2(c).)

California consumers interacted with the chat feature on Defendant's Website a single time during the Class period, statutory damages exceed $5,000,000. *See* Cal. Penal Code § 637.2(a)(1). Upon information and belief, many times that number of consumers have interacted with Defendant's chat feature during the Class period. Based upon the information available to Plaintiff Sonia Garcia ("Plaintiff"), there are believed to be at least 1,000 class members, each entitled to $5,000 in statutory damages, thus making the amount in controversy at least $5,000,0000, exclusive of interests and costs.

2. In addition, Plaintiff seeks an award of attorneys' fees under California's private attorney general doctrine as codified by statute. (Cal. Civ. Proc. Code § 1021.5.); *see Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1156 (9th Cir. 1998) ("We hold that where an underlying statute authorizes an award of attorneys' fees, ***either with mandatory or discretionary language***, such fees may be included in the amount in controversy.") (emphasis added).

3. In *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1125-26 (9th Cir. 2020), the Ninth Circuit affirmed the district court's award of $3.89 million in attorney fees and costs in a CIPA certified class action settlement. *See also Kissel v. Code 42 Software, Inc.*, 2018 WL 6113078, at *5 (C.D. Cal. Feb. 20, 2018) (Staton, J.) (finding as reasonable as reasonable billing rate of Plaintiff's lead counsel (who is counsel of record in the instant action) of $750 per hour based on time incurred dating back to 2015).

4. Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the acts and events giving rise to the claims occurred in this District.

5. Defendant is subject to jurisdiction in this state because the exercise of jurisdiction over Defendant is not inconsistent with the Constitution of this state or the United States. Plaintiff is informed and believes, and thereon alleges that Defendant has extensively solicited business from California residents and transacted business with them such that the exercise of jurisdiction in California would not be based on "random, fortuitous or attenuated" contacts. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984).

## PARTIES

6.    Plaintiff is a resident and citizen of California.  In 2023, while physically within California, Plaintiff visited Defendant's Website using a smart phone and conducted a brief conversation with an agent of Defendant through the Website's chat feature.  Plaintiff was not advised that the chat was monitored, intercepted, or recorded, nor did she consent thereto.

7.    Defendant is a corporation incorporated in the state of Delaware with a principal place of business located in the state of Florida.  Defendant sells homes and related items to the general public throughout the United States and in this Judicial District.

8.    Defendant owns, operates, and/or controls the Website.

## FACTUAL ALLEGATIONS

**Background of CIPA.**

9.    CIPA prohibits both wiretapping and eavesdropping of electronic communications without the consent of all parties to the communication.  "'[T]he right to control the nature and extent of the firsthand dissemination of [one's] statements'" is viewed by the California Supreme Court "as critical to the purposes of Section 631[.]" *Javier v. Assurance IQ, LLC*, 2023 WL 114225, at *6 (N.D. Cal. Jan. 5, 2023) (Breyer, J.) (quoting *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985)); *Ribas*, 38 Cal. 3d at 360-61 ("a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device").  "[U]nder Section 631, it has always mattered who is holding the tape recorder[.]" *Javier*, 2023 WL 114225, at *6.

10.     Compliance with CIPA is easy, and most website operators comply by conspicuously warning visitors if their conversations are being recorded, intercepted, or eavesdropped upon.[2]

11.     Unlike most companies, Defendant *ignores* CIPA.  Instead, Defendant enables and allows a third party that has no corporate affiliation with Defendant to eavesdrop on all such conversations.  Why?  Because, as one industry expert notes, "*Live chat transcripts are the gold mines of customer service.  At your fingertips, you have valuable customer insight to make informed business decisions. . . .**When people are chatting, you have direct access to their exact pain points.***").  *See* https://www.ravience.co/post/improve-marketing-roi-live-chat-transcripts  (last  visited Jul. 13, 2023) (emphasis added).

12.     Defendant's actions are not incidental to facilitating e-commerce, nor are they undertaken in the ordinary course of business. To the contrary, as noted above, Defendant's actions violate industry norms and the legitimate, reasonable expectations of consumers.

**Defendant Allows Salesforce to Intercept Consumers' Chats During Transmission.**

13.     To enable the eavesdropping, Defendant has allowed a third party, Salesforce, to covertly embed its chat technology code into Defendant's chat feature which allows "Salesforce [to] automatically create[] a transcript for each chat session." https://help.salesforce.com/s/articleView?id=sf.live_agent_chat_transcripts.htm&type= 5 (last visited Jul. 14, 2023).

14.     When a Website user opts to utilize the chat feature, they are first prompted to provide personally identifying information ("PII") that is mandatory to engage with the chat including the user's full name and email address:

---

[2]     https://www.leechtishman.com/insights/blog/the-california-invasion-of-privacy-act-californias-wiretap-act/ ("*[C]ompliance [with CIPA] is not difficult.  A business must take certain steps, as part of its privacy program, to ensure that **any time the business is gathering**, either automatically, or **with a chat feature**, personal data of a consumer/website visitor, that it obtains valid consent consistent with the holdings and determinations of the courts interpreting CIPA* and other applicable Data Privacy laws.") (last visited Jul. 13, 2023) (emphasis added).

**FIGURE 1**



15.     This PII is automatically shared with Salesforce when beginning the chat:

**FIGURE 2**



16.     As a user chats on the Website, Defendant permits and enables Salesforce to intercept the incoming chats in real-time:

**FIGURE 3**



**FIGURE 4**



**FIGURE 5**



17.    In fact, Salesforce is receiving the intercepted chats *as they are being typed by the user*, not just when the use presses "enter":

**FIGURE 6**



**FIGURE 7**

FIRST AMENDED CLASS ACTION COMPLAINT

18.    In other words, before the chat even gets to Defendant, Salesforce is intercepting it, copying it, and then forwarding it along to Defendant.  The chats meant for Defendant are first routed *through* Salesforce.

19.    As shown above, the secret code is a type of automatic routing software that automatically acquires and transmits user chat communications to Salesforce without any active input from either Defendant's employees, agents, or human representatives, or Salesforce's employees, agents, or human representatives.

20.    One might reasonably wonder why Salesforce would be interested in intercepting and recording the Website chat interactions between Defendant and unsuspecting visitors to Defendant's Website.  As shown below, it all about money.

21.    The Salesforce software is integrated with social media platforms like Facebook: "Create personalized experiences that are connected across channels — from your website, mobile app, SMS, WhatsApp, Facebook Messenger, and more."  *See* https://www.salesforce.com/products/contact-center/  (last visited December 2023); https://tray.io/blog/facebook-lead-ads-salesforce ("Facebook lead ads are an excellent channel to target sales prospects, and pay dividends when you can connect your lead ads data with your CRM, such as Salesforce.") (last visited December 2023).

22.    The integration allows various software sub-systems to share data to operate as a unified system.  According to Bloomberg.com, this is all part of Meta's secret "plan to profit from private chats."  As Bloomberg explained, Meta's software integration "can manage customer messages from multiple services on one central dashboard. That's central to Meta's plan to make money off of its two messaging apps, WhatsApp and Messenger."  *See*  https://www.bloomberg.com/news/articles/2022-02-15/meta-closes-1-

billion-kustomer-deal-after-regulatory-review (last visited December 2023) (emphasis added).

23.    So how does it work?  First, Meta identifies "user interests" by monitoring a collection of "offsite" user activity such as website visits and interactions (including private chat communications between Defendant and visitors) by "integrating" its software with Salesforce's software.  Second, Meta generates revenue by selling advertising space through its subsidiaries' ability to identify those offsite user interests. Third and finally, after the chat transcripts intercepted by Salesforce are provided to Meta through "integration", Meta brands like Facebook and WhatsApp bombard the unsuspecting Website visitors with targeted advertising based upon the user's Website visits, chats and interactions.

24.    Through the preceding acts, Meta subsidiaries can freely boast that they can "Transform your support center into a profit generator by bulk messaging specific customer segments based on your unique data…to reengage dissatisfied customers." *See* https://www.kustomer.com/product/customer-service/ (last visited December 2023). Indeed, all of the schemers – Defendant, Salesforce, and Meta – all profit from secretly exploiting the chat data through targeted social media advertising because "Targeted advertising allows brands to send different messaging to different consumers based on what the brand knows about the customer. The better a brand can demonstrate that it understands what its customers want and need, the more likely customers respond to advertising and engage with the brand. . . . Social media targeting helps brands leverage consumers' behavior on the web, search engines, and social media sites to present ads that reflect consumer interests."  *See* https://www.adroll.com/blog/what-is-targeted-advertising#:~:text=Targeted%20advertising%20allows%20brands%20to,and%20engage%20with%20the%20brand (last visited December 2023).

25.    As such, Salesforce does more than merely provide a storage function for Website users' chat communications with Defendant.  It is more than the proverbial "tape-recorder" in the hand of Defendant.  Instead, Salesforce uses its record of Website

users' interactions with Defendant's chat feature for data analytics and marketing/advertising to consumers. Salesforce's exploitation, monetization, use of, and interaction with the data it gathers through the chat feature on Defendant's Website in real time makes it a third-party interceptor and eavesdropper known to and enabled by Defendant under section 631(a), rather than a mere extension of Defendant and/or party to the communication with Website visitors.

26.    Defendant did not inform Class members that Defendant was secretly allowing, aiding, and abetting Salesforce to intercept and eavesdrop on the conversations during transmission, or that Salesforce provided data from such transcripts to Meta and similar entities through "integration" of their softwares.

27.    Defendant did not obtain Plaintiff's or the Class members' express or implied consent for the preceding intrusions, nor did Plaintiff or Class members know at the time of the conversations of Defendant's conduct. Indeed, as shown in Figures 1 and 3, there is nothing on the chat function to even tend to indicate or disclose Salesforce is involved.

**The Right to Privacy Has Always Been a Legally Protected Interest in the United States.**

28.    Since America's founding, privacy has been a legally protected interest at the local, state, and federal levels. *See Patel v. Facebook, Inc.*, 932 F.3d 1264, 1271–72 (9th Cir. 2019) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)) ("Privacy rights have long been regarded 'as providing a basis for a lawsuit in English or American courts.'"); and *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) ("Violations of the right to privacy have long been actionable at common law.").

29.    More specifically, privacy protections against the disclosure of personal information are embedded in California statutes and at common law. *See, e.g.*, *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989) ("The Ninth Circuit has repeatedly held that privacy intrusions may constitute "concrete injury" for purposes of Article III standing); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d

1037, 1041–43 (9th Cir. 2017) (finding "concrete injury" where plaintiffs claimed that unsolicited telemarketing calls "invade the privacy and disturb the solitude of their recipients*"); In re Facebook, Inc. Internet Tracking Litig*., 956 F.3d 589, 599 (9th Cir. 2020) (finding "concrete injury" where Facebook allegedly tracked users' "personally identifiable browsing history" on third party websites); *Patel*, 932 F.3d at 1275 (finding "concrete injury" where plaintiffs claimed Facebook's facial-recognition technology violated users' privacy rights).

30.     In short, the privacy of personal information is—and has always been—a legally protected interest in many contexts. Thus, a defendant whose acts or practices violate consumer privacy inflicts an actionable "injury" upon an individual.

**Defendant Secretly Installs Tracking Software on the Devices of All Visitors To Its Website In Violation of California Law.**

31.     Every device connected to the internet has a unique internet protocol ("IP") address, typically consisting of a sequence of numbers. *See United States v. Caira*, 833 F.3d 803, 805 (7th Cir. 2016).  An IP address "is used to route information between devices." *United States v. Ulbricht*, 858 F.3d 71, 84 (2d Cir. 2017).

32.     A "session" represents the time a particular device is connected to a particular website.  Each session reveals information about a user in addition to the unique IP address, such as the user's operating system name, operating system version number, browser name, browser version number, browser language, screen resolution, geolocation data, and device signature.

33.     Using tracking software, a website owner can gather information from visitor devices that visit a particular website to create a unique digital profile of each specific website visitor.  This process is known as "digital fingerprinting."

34.     If a website owner can link a unique digital profile created by digital fingerprinting to a particular individual, the website owner can assemble a detailed picture of a person's private life, including: the online services for which an individual has registered; personal interests based on websites visited; organizational affiliations; where

the individual has been physically; a person's political and religious affiliations; individuals with whom they have leanings and with whom they associate; and where they travel, among other things. See https://www.priv.gc.ca/en/opc-actions-and-decisions/research/explore-privacy-research/2013/ip_201305/ (last downloaded December 2023).

35. For the preceding reasons, the ability to link a unique digital profile to a specific individual using digital fingerprinting is of great monetary value. Indeed, it has created an entire industry known as "identity resolution." Identity resolution is generally defined as "the ability to recognize an individual person, in real-time, by connecting various identifiers from their digital interactions across devices and touchpoints." *See* https://www.fullcontact.com/identity-resolution/ (last visited December 2023).

36. One of the means by which a website owner can gather digital fingerprints as part of its identity resolution efforts is by deploying "pen register" and/or "trap and trace" software on its website.

37. The following graphic shows how a website deploying pen register and trap and trace software has gathered and assimilated the digital fingerprints of a website visitor to create a unique digital identifier and link it to a previously anonymous individual named Mary Smith, thereby revealing a treasure trove of private information about Mary Smith's private life:



38.    In the above example, identity resolution has been achieved: using pen register and trap and trace software, the website owner has gathered and assimilated sufficient digital fingerprints of an anonymous visitor to identify that visitor as Mary Smith, and now knows the following information about her:

(a) Full name *(Mary Smith)*

(b) Date of birth *(May 1, 1979)*

(c) Gender *(female)*

(d) Home address *(2345 Avenue C, Papillion Nebraska)*

(e) Marital Status and Family *(Married with two children)*

(f) E-mail address *(*Mary.Smith@gmail.com*)*

(g) Personal Cell Phone: *(111) 123-4567*

(h) Voter Registration Status *(Registered)*

(i) Interests *(Shopping, Cooking, Traveling, Reading, Science)*

(j) Employer *(Karen's Fireside, Inc.)*

(k) Title *(Vice President)*

(l) Work Hours *(Daily 9-5)*

39.    Because of the extraordinary privacy implications and potential for abuse, California law prohibits the deployment of pen register or trap and trace software without

first obtaining a court order. Cal. Penal Code § 638.51 ("CIPA Section 638.51").  CIPA defines a "pen register" broadly to include "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication" *Id.* § 638.50(b).  CIPA likewise defines "trap and trace" software broadly to include "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."  *Id.* ¶ 638.50(c).

40.    CIPA imposes civil liability and statutory penalties for the installation of pen register or trap and trace software without a court order.  *Id.*; *see also Greenley v. Kochava*, 2023 WL 4833466, at *15-*16 (S.D. Cal. July 27, 2023).

41.    Defendant knowingly and intentionally deployed on its website software marketed by companies called "HotJar" and "ATData" (formerly "Rapleaf") to (1) decode and record the routing, addressing, and signaling information transmitted by Plaintiff's electronic device communication; and (2) capture the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication.

42.    The following visuals show the "HotJar" and "Rapleaf" scripts operating as pen register and trap and trace devices on Defendant's website:

**FIGURE 8**



**FIGURE 9**

43.    Indeed, HotJar admits that its software operates as a "tracking code". *See* https://help.hotjar.com/hc/en-us/articles/6952777582999-Cookies-Set-by-the-Hotjar-Tracking-Code ("*Hotjar Tracking Code cookies are set on a visitor's browser when they visit a website that loads the Hotjar Tracking Code. These cookies allow the Hotjar Tracking Code to function correctly. Apart from cookies, the Hotjar Tracking Code uses local and session storage as well.*" (last downloaded December 2013).

44.    Likewise, ATData admits that its tracking pixel is used to "Identify and Retarget Unknown Users on Your Website." *See* https://atdata.com/website-visitor-id/ (last downloaded December 2023).

45.    As explained above, Defendant knowingly and intentionally deployed a software device and process to (1) decode and record the routing, addressing, and signaling information transmitted by Plaintiff's electronic device communication; and (2) capture the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication,  Defendant did so as part of its identity resolution efforts.  This conduct constitutes illegal installation of both "pen register" and "trap and trace" software in violation of California law. *See Greenley v. Kochava*, 2023 WL 4833466, at *15-*16 (S.D. Cal. July 27, 2023).

46.    Defendant did not obtain Plaintiff's knowing and informed consent to the preceding acts, nor did Defendant obtain a court order authorizing it to do so.

## CLASS ALLEGATIONS

47.    Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

**All persons within the state of California who within the statute of limitations period: (1) communicated with Defendant via the chat feature on Defendant's Website and whose communications were eavesdropped upon without prior consent; or (2) visited Defendant's Website and whose privacy was violated as described above.**

48.    NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members may be ascertained by the records maintained by Defendant.

49.    COMMONALITY: Common questions of fact and law exist as to all Class Members, and predominate over any questions affecting only individual members of the Class.  Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

a.    Whether Defendant caused electronic communications from class members with the Website to be recorded, intercepted, and/or monitored by a third party;

b.    Whether Defendant aided and abetted the third party in eavesdropping on such communications;

c.    Whether Plaintiff and Class Members are entitled to statutory penalties; and

d.    Whether Class Members are entitled to injunctive relief.

50.    TYPICALITY: As a person who visited Defendant's Website and whose chat was recorded, intercepted and eavesdropped upon without prior knowledge or consent, Plaintiff is asserting claims that are typical of the Class.

51.    ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of The Class. Plaintiff has retained attorneys experienced in the class action

litigation.  All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

52.    SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient.  Even if every Class Member could afford individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

## FIRST CLAIM FOR RELIEF

### Violations of the California Invasion of Privacy Act

### Cal. Penal Code § 631(a)

53.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

54.    Section 631(a) of California's Penal Code imposes liability upon any entity that "by means of any machine, instrument, contrivance, or in any other manner," (1) "intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system," or (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state" or (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained" or (4) "**who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.**" (emphasis added).

55.    Here, Defendant "aids, agrees with, employs, [and] conspires with [Salesforce]" to willfully, and without the consent of Plaintiff or other members of the

class, to read and learn the contents and meaning of the chat communications of the Website users while in transit within this state. Defendant and Salesforce then use and communicate the information so obtained with yet more parties to target and specifically market to Plaintiff and the class for Defendant's and Salesforce's own monetary gain.

56. Section 631 of the California Penal Code applies to internet communications and thus applies to Plaintiff's and the Class's electronic communications with Defendant's Website. "Though written in terms of wiretapping, Section 631(a) applies to Internet communications. It makes liable anyone who 'reads, or attempts to read, or to learn the contents' of a communication 'without the consent of all parties to the communication.' *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. 2022).

57. Salesforce's software embedded on the Website by Defendant to record and eavesdrop upon the Class's communications qualifies as a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct alleged herein.

58. At all relevant times, Defendant intentionally caused the internet communication between Plaintiff and Class Members with Defendant's Website to be recorded by Salesforce in real time.

59. Plaintiff and Class Members did not expressly or impliedly consent to any of Defendant's actions.

60. Defendant's conduct constitutes a violation of the fourth clause of Cal. Penal Code § 631(a), entitling Plaintiff and Class members to injunctive relief and statutory damages.

## **SECOND CLAIM FOR RELIEF**

### **Violations of the California Invasion of Privacy Act**

### **Cal. Penal Code § 638.51**

61. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

62. Section 638.51 of the Penal Code provides that it is illegal to "install or use a pen register or a trap and trace device without first obtaining a court order pursuant to

Section 638.52 or 638.53." (Penal Code § 638.51(a).) A "'Pen register' means a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." (Penal Code § 638.50(b).)

63.   Defendant knowingly and criminally deployed pen register and trap and trace software to access Plaintiff's device, install tracking software, and obtain Plaintiff's IP address and other information. *See Greenley*, 2023 WL 4833466, at *15-*16.

64.   Plaintiff did not consent to either Defendant's actions.

65.   Plaintiff suffered both an economic injury and an intangible injury to Plaintiff's dignity caused by the violation of Plaintiff's right to privacy. *Friddle v. Epstein*, 16 Cal. App. 4th 1649, 1660-61 (1993) ("Any invasion of privacy involves an affront to human dignity"); *id.* at 1661 (rejecting argument "that section 637.2 does not kick in until actual damages begin to be incurred").

66.   Plaintiff is entitled to statutory damages of $5,000. *See* Penal Code § 637.2(a)(1).

67.   By knowingly violating a criminal statute and illegally accessing Plaintiff's device to install tracking software, Defendant acted with oppression and malice. As such, Defendant is liable for punitive damages pursuant to section 3294 of the California Civil Code.

68.   The Class members suffered the same intrusion, and are entitled to the same recovery of damages as Plaintiff.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1.   An order certifying the Class, naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class counsel;

2.   An order declaring Defendant's conduct violates CIPA;

3.   An order of judgment in favor of Plaintiff and the Class and against Defendant on the claims for relief asserted herein;

FIRST AMENDED CLASS ACTION COMPLAINT

4.    An order enjoining Defendant's conduct as alleged herein and any other
injunctive relief that the Court finds proper;

5.    Statutory damages pursuant to CIPA;

6.    Punitive damages;

7.    Prejudgment interest;

8.    Reasonable attorneys' fees and costs; and

9.    All other relief that would be just and proper as a matter of law or equity,
as determined by the Court.

Dated: December 15, 2023                    PACIFIC TRIAL ATTORNEYS, APC

By:_____
Scott. J. Ferrell
Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on March 8, 2023, I electronically filed the foregoing **FIRST AMENDED CLASS ACTION COMPLAINT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing via electronic mail to all counsel of record.

Dated:  December 15, 2023

*/s/ Scott J. Ferrell*
Scott J. Ferrell