**PACIFIC TRIAL ATTORNEYS**
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
4100 Newport Place Drive, Suite 800
Newport Beach, California 92660
Telephone: (949) 706-6464
Facsimile: (949) 706-6469

Attorneys for Plaintiff

**UNITED STATE DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

SILVIA GARCIA, individually and on behalf of all others similarly situated,

Plaintiff,

v.

LENNAR CORPORATION, a Delaware entity d/b/a WWW.LENNAR.COM,

Defendant.

Case No. 2:23-cv-10298-FMO-DFM

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND DISMISS OR STAY LITIGATION**

[Declarations of Silvia Garcia and Scott J. Ferrell filed concurrently herewith]

Date: February 22, 2024
Time: 10:00 a.m.
Courtroom: 6D
Judge: Hon. Fernando M. Olguin

# TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION ........ 1

II. ARGUMENT ........ 1

A. The Court Should Not Compel Arbitration. ........ 1

1. Legal Standard ........ 1

2. Whether or Not Gateway Issues of Arbitrability Were Delegated to the Arbitrator Is Irrelevant to Deciding the Instant Motion. ........ 3

3. The Arbitration Clause Is Unenforceable Due to Lack of Actual Notice to Plaintiff. ........ 4

4. The "Terms & conditions" Hyperlink Buried at the Bottom of Footer of Each Webpage Is Insufficient Under Ninth Circuit Case Law to Amount to Constructive Notice. ........ 5

a. There Is No Evidence that Plaintiff Was Aware that She Was Binding Herself to Defendant's Terms and Conditions Merely By Using the Website. ........ 6

b. The Design and Content of the Website Did Not Make the Terms & Conditions Readily and Obviously Available to the User. ........ 6

i. There Is No Mechanism that Forces the User to Actually Examine Defendant's Terms and Conditions. 7

ii. Defendant Failed to Design Its Website to Provide an Explicit Textual Notice or Admonition to Review Its Terms and Conditions. ........ 8

iii. Neither the "Terms & conditions" Name for the Hyperlink at Issue Nor the Title of the Actual Hyperlinked Document Are Self-Defining. ........ 10

iv. The Hyperlink Is Subtle. ........ 11

v. The "Terms & conditions" Hyperlink at the Bottom of Each Webpage Is Buried Amongst 96 Hyperlinks. ........ 13

c. The Third *Berkson* Factor Is Neutral. .................................... 14

d. Defendant Did Not Clearly Draw the Consumer's Attention to Material Terms that Would Alter What a Reasonable Consumer Would Understand to Be Her Default Rights When Initiating an Online Consumer Transaction From the Consumer's State of Residence. ........................................... 14

e. Plaintiff's Status as a "Tester" Proves Nothing Relevant to the Constructive Notice Analysis. ............................................... 15

5. The Recent Decision in *Byars v. The Goodyear Tire and Rubber Co.* Is Directly on Point. ........................................................................ 17

B. The Court Should Reject Defendant's Smear Attack Tactics. ................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Applebaum v. Lyft, Inc.*,
263 F. Supp. 3d 454 (S.D.N.Y. 2017) ....................11, 13

*Berkson v. Gogo LLC*,
97 F. Supp. 3d 359 (E.D.N.Y. 2015) .................... *passim*

*Berman v. Freedom Financial Network, LLC*,
30 F.4th 849 (9th Cir. 2022) ....................3, 4

*Blue Cross Blue Shield of Massachusetts, Inc. v. BCS Ins. Co.*,
671 F.3d 635 (7th Cir. 2011) ....................19, 20

*Bruno v. Quten Research Inst., LLC*,
280 F.R.D. 524 (C.D. Cal. 2011)....................18

*Byars v. The Goodyear Tire and Rubber Co.*,
2023 WL 1788553 (C.D. Cal. Feb. 3, 2023) ....................17, 18

*Fteja v. Facebook, Inc.*,
841 F. Supp. 2d 829 (S.D.N.Y. 2012) ....................7

*Garcia v. Hanjin International Corp.*,
2021 WL 4260408 (C.D. Cal. June 16, 2021) (Gutierrez, J.)....................18

*Henderson v. Peterson*,
2011 WL 2838169 (N.D. Cal. July 15, 2011) (Armstrong, J.)....................19

*Holloway v. Full Spectrum Lending*,
2007 WL 7698843, at *8 (C.D. Cal. June 26, 2007) (Carter, J.)....................19

*Langer v. Kiser*,
57 F.4th 1085 (9th Cir. 2023) ....................18

*Lobato v. Gomez*,
2017 WL 931824 (E.D. Cal. Mar. 8, 2017)....................19

*Molski v. Evergreen Dynasty Corp.*,
521 F.3d 1215 (9th Cir. 2008) (Berzon, J., dissenting from denial of rehearing en banc)....................19

*Native American Arts, Inc. v. Peter Stone Co., U.S.A., Inc.*,
222 F. Supp. 3d 643 (N.D. Ill. 2016), *appeal dismissed*, No. 16-4278 (7th Cir. Oct. 4, 2017) ........ 19

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) ........ *passim*

*PDC Labs., Inc. v. Hach Co.*,
No. 09–1110, 2009 WL 2605270 (C.D. Ill. Aug. 25, 2009) ........ 11, 12, 13

*Peng v. Uber Techs., Inc.*,
237 F. Supp. 3d 36 (E.D.N.Y. 2017) ........ 8

*Portillo v. ICON Health & Fitness, Inc.*,
2019 WL 6840759 (C.D. Cal. Dec. 16, 2019) (Wright, J.) ........ 18

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004) ........ 15, 16

*Selden v. Airbnb, Inc.*,
2016 WL 6476934 (D.D.C. Nov. 1, 2016) ........ 2

*Specht v. Netscape Communications Corp.*,
306 F.3d 17 (2d Cir. 2002) ........ 1, 2

*Starke v. Squaretrade, Inc.*,
2017 WL 3328236 (E.D.N.Y. Aug. 3, 2017) ........ 6

*Starke v. SquareTrade, Inc.*,
913 F.3d 279 (2d Cir. 2019) ........ 15, 16, 17

*Wilson v. Huuuge, Inc.*,
944 F.3d 1212 (9th Cir. 2019) ........ *passim*

**California Cases**

*Long v. Provide Commerce, Inc.*,
245 Cal. App. 4th 855 (2016) ........ *passim*

*Sellers v. Just Answer LLC*,
73 Cal. App. 5th 444 (2021) ........ *passim*

*Wilson v. Murillo*,
163 Cal. App. 4th 1124 (2008) ........ 18, 19

**California Statutes**

Penal Code
§ 630 *et seq*. ..................................................................................................19
California Invasion of Privacy Act .......................................................................19

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

The instant Motion to Compel Arbitration should be denied because Defendant has failed to meet its evidentiary burden of showing that Plaintiff agreed to Defendant's arbitration provision contained within its online Terms and Conditions, and unambiguously manifested her assent to such online Terms and Conditions including the arbitration provision contained therein. Although Defendant relies upon the existence of an inconspicuous hyperlink named "Terms & conditions" located at the bottom of various webpages buried amongst as many as 96 hyperlinks (including five social media hyperlinks), Defendant is relying upon a "browsewrap" type of electronic contract of adhesion, which is routinely rejected by both federal and California courts as lacking the conspicuousness needed to be legally binding upon California website consumers. Defendant's Motion completely ignores the relevant factors and analysis to find constructive notice, and erroneously argues that this Court lacks the power to decide whether a valid arbitration clause even exists, *i.e.*, was agreed upon by the parties. Accordingly, the Court should deny the Motion.

## II. ARGUMENT

### A. The Court Should Not Compel Arbitration.

#### 1. Legal Standard

As the movant, Defendant must prove by a preponderance of the evidence that a valid contract to arbitrate was formed. *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1219 (9th Cir. 2019).

"'While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract.'" *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (citation omitted). "One such principle is the requirement that '[m]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract.'" *Id.* (citation omitted).

"Reasonably conspicuous notice of the existence of contract terms and

unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility." *Specht v. Netscape Communications Corp.*, 306 F.3d 17, 35 (2d Cir. 2002), *quoted in Sellers v. Just Answer LLC*, 73 Cal. App. 5th 444, 469 (2021) and *Long v. Provide Commerce, Inc.*, 245 Cal. App. 4th 855, 865 (2016).

"California law is clear-'an offeree, regardless of apparent manifestation of his consent, is not bound by ***inconspicuous*** contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Sellers*, 73 Cal. App. 5th at 461 (quoting *Long v. Provide Commerce, Inc.*, 245 Cal. App. 4th 855, 862 (2016)) (emphasis added).

"Most courts now have identified at least four types of internet contract formation, most easily defined by the way in which the user purportedly gives their assent to be bound by the associated terms: browsewraps, clickwraps, scrollwraps, and sign-in wraps." *Sellers*, 73 Cal. App. 5th at 463.

"A '*browsewrap*' agreement is one in which an internet user accepts a website's terms of use merely by browsing the site." *Sellers*, 73 Cal. App. 5th at 463 (quoting *Selden v. Airbnb, Inc.*, 2016 WL 6476934, at *4 (D.D.C. Nov. 1, 2016) (emphasis in original)); *Sellers*, 73 Cal. App. 5th at 470 (stating that in browsewrap agreement, "the website provider assumes assent is given by mere use of the website"); *Nguyen*, 763 F.3d at 1176 (stating that under browsewrap agreement, the user "'gives his assent simply by using the website'") (citation omitted). In a browsewrap agreement, "a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen." *Nguyen*, 763 F.3d at 1176. "'The defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists." *Id.* (citation omitted). "[A] browsewrap agreement . . . in which the website provider assumes assent is given by mere use of the website, based exclusively on the existence of a hyperlink that takes the consumer to the applicable set of contract terms—is not sufficient

to bind the consumer." *Sellers*, 73 Cal. App. 5th at 470 (citing *Long*, 245 Cal. App. 4th at 865, 867 and *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 396 (E.D.N.Y. 2015)).

Under the Ninth Circuit opinion in *Nguyen*, *supra*, a website's purported "terms of use" can only be enforced where the plaintiff had either actual or constructive notice of the defendant's terms of use. *Nguyen*, 763 F.3d at 1176 ("Because no affirmative action is required by the website user to agree to the terms of a contract other than his or her use of the website, the determination of the validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions.") (citation omitted). "In the absence of actual knowledge, a reasonably prudent user must be on constructive notice of the terms of the contract for a[n] . . . agreement to be valid." *Huuuge, Inc.*, 944 F.3d at 1220. Actual notice of a website's "terms of use" exists if the user "was required to affirmatively acknowledge the Terms of Use before completing his online purchase." *Nguyen*, 763 F.3d at 1176. "Users are put on constructive notice based on the conspicuousness and placement of the terms and conditions, as well as the content and overall design of the app." *Huuuge*, 944 F.3d at 1220.

### 2. Whether or Not Gateway Issues of Arbitrability Were Delegated to the Arbitrator Is Irrelevant to Deciding the Instant Motion.

Although Defendant argues that gateway issues of arbitrability were delegated to the arbitrator to decide under its arbitration clause's provisions, (Def.'s Mem. at 6:17-7:17), such issue is irrelevant to deciding the instant Motion. As the Ninth Circuit has consistently explained, the crucial threshold question for the Court to decide (not the arbitrator) is whether a valid arbitration clause was agreed upon by the parties at all. *Berman v. Freedom Financial Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022); *Huuuge, Inc.*, 944 F.3d at 1219 ("The limited role of the district court under the FAA is to determine '(1) ***whether a valid agreement to arbitrate exists*** and, if it does, (2) whether the agreement encompasses the dispute at issue.'") (emphasis added) (citation omitted). That is an issue for this Court to decide regardless of any delegation clause in an arbitration

provision.

Notably, Defendant's Memorandum avoids citing any Ninth Circuit decision that contradicts either *Berman* or *Huuuge*, which indicate that this Court must decide whether a valid arbitration clause was agreed upon by the parties. Such omission speaks volumes. Defendant's thinly-veiled assumption that this Court cannot decide whether the parties assented to Defendant's online Terms and Conditions containing its arbitration provision because such arbitration clause contains a delegation clause defies credulity.

**3. The Arbitration Clause Is Unenforceable Due to Lack of Actual Notice to Plaintiff.**

Defendant relies upon the hyperlink at the bottom of its various webpages named "Terms & conditions." (Def.'s Mem. at 1:13-14; 3:1-2; 10:4-6.) The record is ***undisputed***, however, that Plaintiff lacked actual notice of the Terms and Conditions on the Website at the time that her claims accrued. Specifically, Plaintiff was unaware of any Terms and Conditions applicable to her use of the Website either prior to or during such usage. (Garcia Decl. ¶ 3.) Plaintiff never saw the Terms and Conditions because she never clicked on any hyperlink[1] containing such terms. *Id.* During her visits to the Website, Plaintiff did not anticipate that she would enter into an ongoing relationship with Defendant governed by extensive contractual terms. *Id.* It is undisputed that if a user does not click on that hyperlink, then the Terms and Conditions do not become visible to the user on the computer screen.

Here, Defendant's Terms and Conditions do not come close to constituting a "clickwrap" agreement "in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use . . . ." *Nguyen*, 763 F.3d at 1175-76. Indeed, Defendant freely acknowledges that its online Terms and Conditions are made available to its Website users via a "browsewrap" type of agreement. (Def.'s

[1] "In the computing world, a hyperlink is a word, phrase, or image—typically underlined or ***in blue font***—that the user can click on to jump to a new document or a new section within the current document." *Sellers v. Just Answer LLC*, 73 Cal. App. 5th 444, 452 n.2 (2021) (emphasis added).

Mem. at 9:7-9.)

Although "courts have consistently enforced . . . agreements where the user had ***actual notice*** of the agreement," *id.* at 1176 (emphasis added), no such evidence of any actual notice exists here. (Garcia Decl. ¶ 3.) "[W]here, as here, there is no evidence that the website user had actual knowledge of the agreement, the validity of the . . . agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Nguyen*, 763 F.3d at 1177.

**4. The "Terms & conditions" Hyperlink Buried at the Bottom of Footer of Each Webpage Is Insufficient Under Ninth Circuit Case Law to Amount to Constructive Notice.**

Where there is no evidence that plaintiff had actual knowledge of purported terms of use, their enforceability "turns on whether the [website] puts a reasonably prudent user on inquiry notice of the terms of the contract." *Nguyen*, 763 F.3d at 1177. To determine that, courts apply four factors:

> "(1) Aside from clicking the equivalent of sign-in (e.g., log-in, buy-now, purchase, etc.), ***is there substantial evidence from the website that the user was aware that she was binding herself to more than an offer of services or goods in exchange for money?*** If not, the "terms of use," such as those dealing with venue and arbitration, should not be enforced against the purchaser.
>
> (2) Did the design and content of the website, including the homepage, make the "terms of use" (i.e., the contract details) ***readily and obviously available to the user?*** If not, the "terms of use," such as those dealing with venue and arbitration, should not be enforced against the purchaser.
>
> (3) ***Was the importance of the details of the contract obscured or minimized by the physical manifestation of assent expected of a consumer seeking to purchase or subscribe to a service or product?*** If yes, then the "terms of use," such as those dealing with venue and arbitration, should not be enforced against the purchaser.

> (4) Did the merchant ***clearly draw the consumer's attention to material terms that would alter what a reasonable consumer would understand to be her default rights when initiating an online consumer transaction from the consumer's state of residence***: The right to (a) not have a payment source charged without notice (i.e., automatic payment renewal); (b) ***bring a civil consumer protection action under the law of her state of residence and in the courts in her state of residence***; and (c) participate in a class or collective action? If not, then (a), (b), or (c) should not be enforced against the consumer."

*Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 402 (E.D.N.Y. 2015) (Weinstein, J.) (emphasis added). "The *Berkson* test has been favorably cited and applied by federal and state trial courts." *Starke v. Squaretrade, Inc.*, 2017 WL 3328236, at *6 (E.D.N.Y. Aug. 3, 2017).

Here, all four of the *Berkson* factors argue against enforcement of the Terms and Conditions because the Website failed to provide constructive notice of the Terms and Conditions as well as the arbitration clause provision contained therein – in fact, the terms here are much more inconspicuous than the terms in *Nguyen*. Defendant has failed to present any evidence that Plaintiff had a sufficient opportunity to read the Terms and Conditions and its arbitration clause and assented to the agreement through an ***unambiguous*** method provided by Defendant.

**a. There Is No Evidence that Plaintiff Was Aware that She Was Binding Herself to Defendant's Terms and Conditions Merely By Using the Website.**

Defendant has offered no evidence supporting the proposition that Plaintiff knew or should have known that she was binding herself to Defendant's Terms and Conditions merely by using the Website. Indeed, as mentioned above, Plaintiff never saw the Terms and Conditions because she never clicked on any hyperlink containing such terms. (Garcia Decl. ¶ 3.)

**b. The Design and Content of the Website Did Not Make the Terms & Conditions Readily and Obviously Available to the User.**

Contrary to Defendant's assumption, the design and content of the Website did not make the Terms and Conditions readily and obviously available to the user for many reasons.

As a preliminary matter, courts have relied upon various criteria to find electronic contracts enforceable based upon a website's textual notices to users. For example, the Ninth Circuit in *Nguyen* discussed "placement," color, and contrast of hyperlinks (*i.e.*, "color-contrasting text") and "the website's general design." *Nguyen*, 763 F.3d at 1177-78. Similarly, *Long* relied upon the "placement, color, size and other qualities [of the terms of service hyperlinks] relative to the . . . [website's] overall design". *Long*, 245 Cal. App. 4th at 866. "Federal courts relying on *Long* and *Nguyen* have generally considered similar criteria when determining whether a textual notice is sufficiently conspicuous under California law. These criteria include: 1) the size of the text; 2) the color of the text as compared to the background it appears against; 3) the location of the text and, specifically, its proximity to any box or button the user must click to continue use of the website; 4) the obviousness of any associated hyperlink; and 5) whether other elements on the screen clutter or otherwise obscure the textual notice." *Sellers*, 73 Cal. App. 5th at 473 (citing cases). "[T]he criteria are largely subjective."[2] *Id.*

**i. There Is No Mechanism that Forces the User to Actually Examine Defendant's Terms and Conditions.**

There is no "mechanism that forces the user to actually examine the terms before assenting." *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837-38 (S.D.N.Y. 2012) (holding that Facebook's Terms of Use are not a "pure-form" clickwrap agreement because there is no "mechanism that forces the user to actually examine the terms before assenting"); *Berkson*, 97 F. Supp. 3d at 404 ("***He was not required to scroll through the***

[2] "[T]he relevant criteria" that federal courts have "applied to evaluate conspicuousness is largely subjective." *Sellers*, 73 Cal. App. 5th at 481. Although the issue of conspicuousness is "typically characterized as a question of law," *Sellers* correctly recognized that courts are "actually conducting" "a fact-intensive inquiry" and making a largely "subjective" analysis, resulting in "seemingly inconsistent results." *Id.* at 473.

***contract of adhesion and its boilerplate terms in order to click 'accept' or 'I agree.'***") (emphasis added). The Terms and Conditions were not set out in a scrollable format. Instead, a subtle hyperlink was used. (Ferrell Decl. ¶¶ 2-10 Ex. 1.)

#### ii. Defendant Failed to Design Its Website to Provide an Explicit Textual Notice or Admonition to Review Its Terms and Conditions.

Defendant failed to draw Plaintiff's attention to the Terms and Conditions by using "signifiers of importance" such as the phrase "please read" or the word "important". *Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d 36, 49 (E.D.N.Y. 2017) (stating that the offerees were "clearly and repeatedly encouraged to click on the contract containing the terms to which they were agreeing"). In *Nguyen v. Barnes & Noble Inc., supra,* the Ninth Circuit rejected the enforceability of an electronic contract of adhesion despite the existence of a conspicuous hyperlink in close proximity to relevant buttons users must click on. The Ninth Circuit held:

> "[W]e therefore hold that where a website makes its terms of use available via a conspicuous hyperlink . . . but otherwise provides no notice to users ***nor prompts them to take any affirmative action to demonstrate assent***, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice. . . . [T]he onus must be on website owners to put users on notice of the terms to which they wish to bind consumers. Given the breadth of the range of technological savvy of online purchasers, consumers cannot be expected to ferret out hyperlinks to terms and conditions ***to which they have no reason to suspect they will be bound***."

*Nguyen*, 763 F.3d at 1178-79 (emphasis added); *id.* at 1178 n.1 ("where courts have relied on the proximity of the hyperlink to enforce a browsewrap agreement, the websites at issue have also included ***something more*** to capture the user's attention and secure her assent") (emphasis added); *id.* at 1177-78 (referring to "explicit textual notice" to "*Review terms*" to determine existence of constructive/inquiry notice) (emphasis in original); *Long*,

245 Cal. App. 4th at 865 (citing footnote 1 of *Nguyen* for proposition that "something more" than a conspicuous hyperlink is necessary to give rise to constructive notice such as "an explicit textual notice warning users to ''Review terms''"); *Sellers*, 73 Cal. App. 5th at 468 (citing *Nguyen* and *Long*). It is undisputed that no such "explicit textual notice" or admonition to review Defendant's Terms & Conditions exists on Defendant's Website.

In *Sellers*, the California Court of Appeal focused on the providers' website design as follows:

> "In our view, it is more appropriate to focus on the providers, which have complete control over the design of their websites and can choose from myriad ways of presenting contractual terms to consumers online. These include clickwrap and scrollwrap agreements that eliminate any uncertainty as to the consumer's notice of contractual terms and assent to those very terms. We therefore agree with the courts in *Long* and *Nguyen* that ' 'the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers. Given the *breadth of the range of technological savvy of online purchasers*, consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound.' ' "

*Sellers*, 73 Cal. App. 5th at 475-76 (emphasis in original) (quoting *Long*, 245 Cal. App. 4th at 867 (quoting *Nguyen*, 763 F.3d at 1179)); *Sellers*, 73 Cal. App. 5th at 481 ("Because website providers have full control over the design of their websites, the onus is on them to provide adequate notice of contractual terms, particularly where, as here, the consumer is not likely expecting to be bound by such terms."); *see also Berkson*, 97 F. Supp. 3d at 382 ("The offeror has thought through the problems with the aid of lawyers and other experts and is a 'repeat player.' ").

*Sellers* noted that it is particularly appropriate to focus on the seller's design of the website when the consumer does not expect to enter into an ongoing contractual relationship:

> "This is particularly true when the transaction is one in which the typical consumer

> would not expect to enter into an ongoing contractual relationship, regardless of whether the transaction occurs online or in person. As we have noted, ***it is questionable whether a consumer buying a single pair of socks, or signing up for a free trial, would expect to be bound by contractual terms, and a consumer that does not expect to be bound by contractual terms is less likely to be looking for them***."

*Sellers*, 73 Cal. App. 5th at 476 (emphasis added).

**iii. Neither the "Terms & conditions" Name for the Hyperlink at Issue Nor the Title of the Actual Hyperlinked Document Are Self-Defining.**

Notably, Defendant has failed to cite anything that indicates that a hyperlink named "Terms & conditions" is self-defining to connote a contract or agreement in the mind of a reasonably prudent consumer.

In addition, the "Terms and Conditions" title of the actual hyperlinked document is not self-defining. "Despite conducting extensive research on the topic, the court in *Berkson* concluded there is very little empirical evidence regarding 'what the average internet user perceives to be the meaning of the phrase 'terms of use' or '***terms and conditions***,' or the degree to which he or she is aware that each time a purchase is conducted over the internet, a binding contract regarding more than just the promise to pay may be being entered into.'" *Sellers*, 73 Cal. App. 5th at 475 (quoting *Berkson*, 97 F. Supp. 3d at 380) (emphasis added). In *Sellers*, the court noted:

> "In [the court's] view, the problem with merely displaying a hyperlink in a prominent or conspicuous place is that, without notifying consumers that the link page contains binding contractual terms, ***the phrase 'terms of use' may have no meaning or a different meaning to a large segment of the [i]nternet-using public***."

*Sellers*, 73 Cal. App. 5th at 469 (emphasis added) (quoting *Long*, 245 Cal. App. 4th at 867).

Similarly, both federal courts and California appellate courts have all recognized that "Terms of Service" is not self-defining to mean "contract" to reasonable consumers. *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 468 (S.D.N.Y. 2017); *Berkson*, 97 F. Supp. 3d at 380; *Long*, 245 Cal. App. 4th at 867 ("the phrase 'terms of use' may have no meaning or a different meaning to a large segment of the Internet-using public").

**iv. The Hyperlink Is Subtle.**

The Terms and Conditions were made available to Website users via only a "subtle hyperlink". *Applebaum*, 263 F. Supp. 3d at 469. In particular, the hyperlink used was subtle because "there were no familiar indicia to inform consumers that there was in fact a hyperlink that should be clicked and that a contract should be reviewed, such as words to that effect," or "capitalization, italization, or large font." *Applebaum*, 263 F. Supp. 3d at 467; *Berkson*, 97 F. Supp. 3d at 404 ("***[t]he hyperlink to the "terms of use" was not in large font, all caps***") (emphasis added).

Although underlining was used by Defendant only if a user hovers over the "Terms & conditions" hyperlink with a mouse, (Ferrell Decl. ¶ 3), that indicia was insufficient to make the "Terms & conditions" hyperlink conspicuous because there was no color-contrasting text to indicate the existence of the "Terms & conditions" hyperlink to the Terms and Conditions. In particular, the "Terms & conditions" hyperlink and underlining are both in the color gray, (Ferrell Decl. ¶¶ 3, 10), which is not color-contrasting at all. Indeed, the Ninth Circuit has recognized the significance of a hyperlink that is "underlined" in "***blue, contrasting text***," coupled together with other indicia. *Nguyen*, 763 F.3d at 1178 (emphasis added) (quoting *PDC Labs., Inc. v. Hach Co.*, No. 09–1110, 2009 WL 2605270, at *3 (C.D. Ill. Aug. 25, 2009) ("Terms [and Conditions of Sale] were hyperlinked on three separate pages of the online ... order process in ***underlined, blue, contrasting text***.") (emphasis added)); *Nguyen*, 763 F.3d at 1178 ("As in *PDC*, the checkout screens here contained "Terms of Use" hyperlinks in underlined, ***color-contrasting text***.") (emphasis added). The Ninth Circuit noted that in *PDC Labs.*, "the federal district court held that ***'[t]his contrasting text is sufficient to be considered***

***conspicuous***,' thereby placing a reasonable user on notice that the terms applied." *Nguyen*, 763 F.3d at 1178 (emphasis added) (quoting *PDC Labs., Inc.*, 2009 WL 2605270, at *3)).

Notably, the Ninth Circuit elaborated that contrasting text, alone, was insufficient to make a hyperlink conspicuous. In particular, the Ninth Circuit noted that the district court in *PDC Labs, Inc.* made the observation that "the terms' conspicuousness was reinforced by the language of the final checkout screen, which read, " 'STEP 4 of 4: *Review terms*, add any comments, and submit order,' " and was followed by a hyperlink to the Terms. *Nguyen*, 763 F.3d at 1178 (emphasis added) (quoting *PDC Labs., Inc.*, 2009 WL 2605270, at *3)) (emphasis in original). Notably, Defendant has failed to cite any case authority indicating that the color gray indicates the existence of a hyperlink. Indeed, the California Court of Appeal recently held, "In the computing world, a hyperlink is a word, phrase, or image—typically underlined or ***in blue font***—that the user can click on to jump to a new document or a new section within the current document." *Sellers*, 73 Cal. App. 5th at 452 n.2 (emphasis added). The reference to "blue font" in *Sellers* is significant. Indeed, in *Sellers*, the Court of Appeal noted that the online merchant's "hyperlink to the terms of service ***is underlined, but it is not set apart in any other way that may draw the attention of the consumer***, such as with ***blue text*** or capital letters." *Sellers*, 73 Cal. App. 5th at 481 (emphasis added).

Furthermore, the font of the "Terms & conditions" hyperlink is very small print. In particular, it is in Mabry Pro font at 12 point size. (Ferrell Decl. ¶ 3 & Ex. 1.) In contrast, the statement, "Find a home you'll love," near the top of the homepage is in the 24 point size. *Id.* ¶ 4 & Ex. 1. The phrase, "Quality homes, built for you," near the top of the homepage is in the 18 point size. *Id.* ¶ 5 & Ex. 1. The phrase, "Something for everyone," near the middle of the homepage is in the 18 point size. *Id.* ¶ 6 & Ex. 1. The phrase, "Everything you need in a home," near the middle of the homepage is in the 18 point size. *Id.* ¶ 7 & Ex. 1. The statement, "Lennar builds new homes in 26 states across the country," near the bottom of the homepage is in the much larger 18 point size in Reckless font. *Id.*

¶ 8 & Ex. 1. Similarly, the statement, "We're here to help you," near the bottom of the homepage is in the much larger 18 point size in Reckless font. *Id.*

Additionally, the hyperlink labeled as "Terms & conditions" is in the same font (*i.e.*, Mabry Pro) and size (12 point) as the immediately surrounding language above and after the hyperlink. (Ferrell Decl. ¶ 3.) Thus, the hyperlink "appear[s] in the same font . . . that, to the unwary [user], could blend in with the" rest of the textual statement in that same area. *Long*, 245 Cal. App. 4th at 866.

Defendant's implied contention that that hyperlink named "Terms & conditions" is in bold lettering, (Def.'s Mem. at 11:3) (referring to "boldback footer"), is mistaken. (Ferrell Decl. ¶ 2 & Ex. 1.)

Finally, the existence of the hyperlink in Defendant's Website was inconspicuous because the hyperlink referred to "Terms & conditions" instead of "Contract" or some other words stating that a contract between Defendant and the user should be reviewed. Indeed, in *Nguyen*, the Ninth Circuit noted that even with a color contrasting hyperlink and text, the crucial difference in *PDC Labs, Inc.* was that the final checkout screen contained the admonition, "*Review terms*." *Nguyen*, 763 F.3d at 1178 (emphasis in original). This admonition made a material difference to the outcome in *Nguyen*, 763 F.3d at 1178 ("This ["Review terms"] admonition makes *PDC* distinguishable, despite the court's explanation that the blue contrasting hyperlinks were sufficiently conspicuous on their own."). "Coloring can be for aesthetic purposes. ***Courts have required more than mere coloring to indicate the existence of a hyperlink to a contract***." *Applebaum*, 263 F. Supp. 3d at 467 (emphasis added). As such, the reasonable consumer would not have been able to discern that a hyperlink setting forth the Terms and Conditions was available for viewing if the user clicked on the hyperlink named "Terms & conditions". That is surely a poor design flaw. If Defendant intended to inform consumers that there was a hyperlink that should be clicked to read a legally binding contract, then Defendant should have designed its Website to notify users to review the Terms and Conditions.

**v. The "Terms & conditions" Hyperlink at the Bottom**

**of Each Webpage Is Buried Amongst 96 Hyperlinks.**

Any reliance on the "Terms & conditions" hyperlink at the bottom of each webpage would be misplaced because such hyperlink is buried amongst 96 different hyperlinks in the black background portion of all webpages at the bottom.[3] (Ferrell Decl. ¶ 2 & Ex. 1); *Nguyen*, 763 F.3d at 1177 ("Where the link to a website's terms of use is buried at the bottom of the page . . . where users are unlikely to see it, courts have refused to enforce the . . . agreement."). The fact that there are so many hyperlinks that seem to have nothing to do with the Terms and Conditions is significant because the sheer volume of such hyperlinks distracts the average user from discerning that the Terms and Conditions are available to review.

**c. The Third *Berkson* Factor Is Neutral.**

Given that Plaintiff was not put in a position in which Defendant put before her physical manifestation of assent expected of a consumer seeking to purchase a product on its Website, the third *Berkson* factor is neutral.

**d. Defendant Did Not Clearly Draw the Consumer's Attention to Material Terms that Would Alter What a Reasonable Consumer Would Understand to Be Her Default Rights When Initiating an Online Consumer Transaction From the Consumer's State of Residence.**

The fourth *Berkson* factor does not support the existence of constructive notice of the Terms and Conditions because there is no evidence in the record showing that Defendant clearly drew Plaintiff's attention to the Terms and Conditions that would alter Plaintiff's understanding about her default rights had she engaged in an online consumer transaction with Defendant from Plaintiff's residence in California. For example, there is nothing to indicate that Defendant clearly drew Plaintiff's attention to the choice of law provision stating that the "laws of the State of Florida" would govern the Terms and

[3] The screenshot of the bottom of the webpage depicted in Exhibit B to the Boone Declaration omits numerous hyperlinks to areas within 26 states of the United States in which Defendant claims to build new homes. (Ferrell Decl. ¶ 2 & Ex. 1.)

Conditions nor the venue clause designating a forum "in the State of Florida, County of Miami-Dade" for "any issues not addressed by this arbitration provision" given that Plaintiff is a California resident. (Garcia Decl. ¶ 4.)

**e. Plaintiff's Status as a "Tester" Proves Nothing Relevant to the Constructive Notice Analysis.**

Although Defendant contends that Plaintiff's status as a "tester" supports the proposition that she had constructive notice of Defendant's arbitration provision, by relying on what Plaintiff should have known based on Plaintiff's interactions with other companies, Defendant ignores that the constructive knowledge inquiry in the Internet context is focused on what steps that the online website operator put together to design its website to put reasonable notice of the existence of the arbitration clause upon the consumer. *Huuuge, Inc.*, 944 F.3d at 1220 ("Users are put on constructive notice based on the conspicuousness and placement of the terms and conditions, as well as the content and overall design of the app."). Thus, Defendant's argument, which focuses upon Plaintiff's conduct with respect to other businesses, is a red herring argument in purporting to establish Defendant's constructive notice upon reasonably prudent users of Defendant's Website.

Moreover, courts have only considered prior course of dealing with respect to a consumer's prior transactions with the same business and even in such circumstances, courts have rejected an inconspicuous hyperlink as providing constructive notice. For example, in *Starke v. SquareTrade, Inc.*, 913 F.3d 279 (2d Cir. 2019), the Second Circuit affirmed the district court's denial of an online seller's motion to compel arbitration. In so doing, the Second Circuit held that the consumer past purchases from the same seller did not put him on actual or inquiry notice of an inconspicuous arbitration provision. *Id.* at 296. The Second Circuit explained as follows:

> "Finally, SquareTrade points to the prior course of dealing between Starke and SquareTrade to demonstrate that Starke was on inquiry notice of terms and conditions that he would receive via email. SquareTrade relies on *Register.com*,

356 F.3d 393, where this Court found that a prior course of dealing between the parties supported the conclusion that they had agreed to certain terms and conditions. In *Register.com*, the party challenging the applicability of the terms and conditions was a sophisticated corporate customer that had made "daily" use of its counter-party's services subject to the terms and conditions, and had been "fully aware" of the terms and conditions that the counter-party sought to enforce. *Id.* at 402. We compared the situation before us then to one in which a person maintains a roadside fruit stand displaying bins of apples with a sign at the exit of the fruit stand telling customers that the apples are 50 cents each. *Id.* at 401. We said that a visitor who comes, takes an apple, bites into it, and does not see the sign until he exits may well believe he has no obligation to pay for the apple because he had no notice when he bit into it that 50 cents was expected in return. *Id.* However, if the visitor returns to the apple stand on a daily basis, each day taking an apple without paying for it, he cannot later use the same defense. *Id.* Based on his prior transaction(s), he knows full well that the owner is offering apples in exchange for 50 cents. *Id.*

Unlike the apple stand visitor, who learns of the terms governing his contract with the owner and feigns ignorance that the same terms will apply in future transactions, ***Starke was not put on notice of SquareTrade's terms and conditions through his prior transactions. Although Starke had transacted with SquareTrade on six prior occasions, SquareTrade never gave Starke clear and conspicuous notice that the transaction would subject him to binding arbitration***. Each time Starke purchased a SquareTrade protection plan through Amazon, he received a confirmation email from SquareTrade which looked just like the confirmation email at issue here. ***The fact that Starke received emails with the same inconspicuous hyperlink on more than one occasion does not lead us to conclude that Starke had either actual or inquiry notice of the Post-Sale T&C***.

On only one occasion (when Starke purchased a SquareTrade protection plan

through Staples) did Starke receive an email from SquareTrade in which the terms and conditions were actually provided in the body of the email. ***In that instance, however, the terms and conditions in the email did not contain an arbitration provision, so that transaction could not have put Starke on notice of such term***. Starke notes that when SquareTrade introduced an arbitration clause into its terms and conditions, it pivoted to providing its terms and conditions via a nondescript hyperlink. Thus, ***the prior course of dealing between Starke and SquareTrade by no means resembles the apple hypothetical in Register.com, and it does not convince us that Starke was on inquiry notice of the arbitration provision contained in the Post-Sale T&C***."

*Starke*, 913 F.3d at 296. *Starke* shows that repeated inconspicuous hyperlinks in websites do not put a consumer on inquiry notice.

**5. The Recent Decision in *Byars v. The Goodyear Tire and Rubber Co.* Is Directly on Point.**

The recent decision in *Byars v. The Goodyear Tire and Rubber Co.*, 2023 WL 1788553 (C.D. Cal. Feb. 3, 2023), provides significant guidance here. In *Goodyear*, the defendant moved to transfer an action based upon a forum selection clause in its online "Terms of Use" hyperlinked to its website. After finding that the defendant's "Terms of Use" "plainly falls into the browsewrap agreement category," *id.* at *3, the court then held:

"Although, the "Terms of Use" can be found at the bottom of the webpage, Goodyear provides no argument suggesting Byars had any reason to scroll to the bottom of the webpage or otherwise saw the "Terms of Use." *See, e.g., Wilson*, 944 F.3d at 1220–21 ("[C]ourts will not enforce agreements where the terms are buried at the bottom of the page or tucked away in obscure corners of the website, especially when such scrolling is not required to use the site.") (internal quotations omitted)). Moreover, Byars affirmatively alleges in the FAC that she did not see the "Terms of Use." [Dkt. 13 at 4, ¶18]. As such, Byars was not on constructive

> notice of the "Terms of Use," and it cannot be enforced against Byars. Therefore, Goodyear's forum selection clause does not apply."

*Goodyear*, 2023 WL 1788553, at *3. *Goodyear* is directly on point and should be followed by this Court.

**B. The Court Should Reject Defendant's Smear Attack Tactics.**

Regrettably, Defendant devotes significant portions of its brief attacking Plaintiff for being a litigation "tester" and asking the Court to draw adverse credibility inferences because Plaintiff is a "serial litigant." The Ninth Circuit recently made exceptionally clear that Defendant's tactics are improper because it is "necessary and desirable for committed individuals to bring serial litigation" to enforce and advance consumer protection statutes, as Plaintiff does here. *See Langer v. Kiser*, 57 F.4th 1085, 1095 (9th Cir. 2023). Defendant should be sternly reminded of the Ninth Circuit's admonition that courts must not discredit and/or penalize a plaintiff for being a litigation tester.

The Court should reject Defendant's smear tactics intended to bias the Court. *Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524, 534 (C.D. Cal. 2011) ("The Court is troubled that Defendants have devoted valuable pages in their Opposition to an apparent smear campaign . . . .").

In *Portillo v. ICON Health & Fitness, Inc.*, 2019 WL 6840759 (C.D. Cal. Dec. 16, 2019) (Wright, J.), the Court denied a defendant's request for judicial notice regarding the plaintiff's involvement in other cases as "irrelevant to [the defendant's] conduct in this action" or to the "resolution of the instant Motion to Dismiss". *Portillo*, 2019 WL 6840759, at *2. The Court held that the defendant's request for judicial notice "contribute[d] nothing to the analysis of the parties' substantive claims for and against dismissal." *Id.* *Portillo* is directly on point.

Defendant's reference to other lawsuits filed by Plaintiff is irrelevant to any issues pertinent to deciding the instant Motion. *Garcia v. Hanjin International Corp.*, 2021 WL 4260408, at *2 (C.D. Cal. June 16, 2021) (Gutierrez, J.) ("Plaintiff's litigation history is immaterial to this motion [to dismiss]."); *Wilson v. Murillo*, 163 Cal. App. 4th 1124, 1128

n.3 (2008) ("we emphasize that [Appellant's] litigation history is immaterial to our resolution of this case"). Defendant's reference to other lawsuits constitutes improper character evidence that is prejudicial to Plaintiff, as Defendant and its counsel surely know.[4]

There is no prohibition against suing multiple parties in different lawsuits for separate and distinct violations of the California Invasion of Privacy Act, Cal. Penal Code § 630 *et seq*. *Holloway v. Full Spectrum Lending*, 2007 WL 7698843, at *8 (C.D. Cal. June 26, 2007) (Carter, J.) ("nothing in the [statute] precludes a plaintiff from suing multiple parties that have violated her rights"); *Wilson v. Murillo*, 163 Cal. App. 4th 1124, 1128 n.3 (2008) ("Numerosity alone, however, is insufficient to show that his lawsuits are frivolous or harassing. . . . 'From all that appears, the number of lawsuits [plaintiff] has filed does not reflect that he is a vexatious litigant; rather, it appears to reflect the failure of the defendants to comply with the law.'"); *cf. Molski v. Evergreen Dynasty Corp.*, 521 F.3d 1215, 1220 (9th Cir. 2008) ("[W]hile self-interest surely drives serial access litigation in part, the reason there *can* be so many lawsuits about access to public accommodations is that there are so many violations of the laws that seek to assure access.") (Berzon, J., dissenting from denial of rehearing en banc) (emphasis in original).

"Such is the nature of 'private-attorney-general' provisions: Congress perceives a wrong but finds it too costly to enforce the law it passes to address that wrong." *Native American Arts, Inc. v. Peter Stone Co., U.S.A., Inc.*, 222 F. Supp. 3d 643, 647 (N.D. Ill. 2016), *appeal dismissed*, No. 16-4278 (7th Cir. Oct. 4, 2017). "[W]ith damages far outstripping the actual loss, it is not surprising that suits like this are filed; private-attorney-general statutes are meant to encourage this." *Id.* "The fact that statutes . . . give rise to 'cottage industries' can't be laid at the feet of attorneys who take advantage of them." *Id.* "The statute is what it is, and judges must implement its rule whether or not

---

[4] *See, e.g., Lobato v. Gomez*, 2017 WL 931824, at *5 (E.D. Cal. Mar. 8, 2017) ("The motion is granted to the extent that the Defendants may attempt to use evidence of prior litigation history solely to show that [plaintiff] has a character trait of litigiousness."); *Henderson v. Peterson*, 2011 WL 2838169, at *6 (N.D. Cal. July 15, 2011) (Armstrong, J.).

they think it wise . . . ." *Blue Cross Blue Shield of Massachusetts, Inc. v. BCS Ins. Co.*, 671 F.3d 635, 638 (7th Cir. 2011).

Dated: January 26, 2024

PACIFIC TRIAL ATTORNEYS, P.C.

By: */s/ Scott J. Ferrell*
Scott. J. Ferrell
Attorney for Plaintiff