**PACIFIC TRIAL ATTORNEYS**
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
4100 Newport Place Drive, Suite 800
Newport Beach, California 92660
Telephone: (949) 706-6464
Facsimile: (949) 706-6469

Attorneys for Plaintiff

**UNITED STATE DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

SILVIA GARCIA, individually and on behalf of all others similarly situated,

Plaintiff,

v.

LENNAR CORPORATION, a Delaware entity d/b/a WWW.LENNAR.COM,

Defendant.

Case No. 2:23-cv-10298-FMO-DFM

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND TO STRIKE**

[Declaration of Scott J. Ferrell; Request for Judicial Notice; Proposed Order filed concurrently herewith]

Date: October 23, 2024
Time: 10:00 a.m.
Courtroom: 6D
Judge: Hon. Fernando M. Olguin

# TABLE OF CONTENTS

**Page(s)**


I. ARGUMENT ........ 1

A. Plaintiff Has Standing to Sue. ........ 1

1. Plaintiff Can Have Standing Even as a "Tester". ........ 1

2. Identifiers Such as An IP Address and Geolocation Data and Browsing History Constitute a Consumer's Personal Information in California as Recognized by California Statutes, Which Support a Reasonable Expectation of Privacy. ........ 6

3. The Website Has Embedded First-Party Cookies of Multiple Third Parties to Surveil Users of the Website. ........ 7

4. The Decisions Cited by Defendant Are Distinguishable. ........ 11

B. The FAC Sufficiently Alleges a Violation of Section 638.51 of the Penal Code. ........ 13

1. Numerous Federal District Courts Have Recognized that Similar Third-Party Spyware Is Either a "Pen Register" or a "Trap and Trace Device". ........ 13

2. The FAC Should Be Liberally Construed. ........ 14

3. The Website's Spyware Qualifies as a "Device or Process" Because It Constitutes "Software that Identifies Consumers, Gathers Data, and Correlates that Data." ........ 15

a. The IP Addresses Collected by the Website's Spyware Qualify as "Addressing Information." ........ 18

b. IP Addresses Are "Transmitted by an Instrument or Facility From Which a Wire or Electronic Communication Is Transmitted." ........ 19

c. The Case Law Supporting Plaintiff's Position Is Both Comprehensive and Persuasive. ........ 21

d. The Argument that Section 638.51 of the Penal Code Should Be Interpreted to Exclude Defendant's Cookies Because Such

Cookies Copy the Content of the Communications Between the Website and Plaintiff and Other Users Is Wrong. ........... 21

4. Defendant Is Not an Electronic Communication Service Provider. 25

5. Defendant's Consent Is Insufficient. ............................................. 25

6. Section 638.51 Provides a Private Right of Action. ........................ 26

C. The FAC Sufficiently Alleges a Violation of Section 631(a) of the Penal Code. ............................................................................................. 26

D. The Prayer for Punitive Damages Should Not Be Stricken. ...................... 27

**CERTIFICATE OF COMPLIANCE** ........................................................................ 1

# TABLE OF AUTHORITIES


**Page(s)**

**Federal Cases**

*Bayer v. Neiman Marcus Group, Inc.*, 861 F.3d 853 (9th Cir. 2017) ....................3

*Brown v. Google LLC*, 525 F. Supp. 3d 1049 (N.D. Cal. 2021) ....................7

*Byars v. Sterling Jewelers, Inc.*, 2023 WL 2996686 (C.D. Cal. Apr. 5, 2023) ....................4

*Byars v. Sterling Jewelers, Inc.*, 2023 WL 4195768 (C.D. Cal. May 18, 2023) ....................4

*Calhoun v. Google, LLC*, 113 F.4th 1141 (9th Cir. 2024) ....................25

*California v. Azar*, 911 F.3d 558 (9th Cir. 2018) ....................2

*California v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 2023 WL 1873087 (N.D. Cal. Feb. 9, 2023) ....................2

*Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836 (N.D. Cal. 2014) ....................5

*Campbell v. Facebook, Inc.*, 951 F.3d 1106 (9th Cir. 2020) ....................4

*Civil Rights Educ. and Enforcement Center v. Hospitality Props. Trust*, 867 F.3d 1093 (9th Cir. 2017) .................... 1, 2, 3, 4

*Commonwealth v. Biden*, 57 F.4th 545 (6th Cir. 2023) ....................2

*Conohan v. Rad Power Bikes Inc.*, 2025 WL 1111246 (C.D. Cal. Apr. 3, 2025) ....................14, 21

*Consumers' Research v. Consumer Prod. Safety Comm'n*, 91 F.4th 342 (5th Cir. 2024) ....................2

*Cottle v. Plaid Inc.*,
536 F. Supp. 3d 461 (N.D. Cal. 2021) ... 25

*Cousin v. Sharp Healthcare*,
681 F. Supp. 3d 1117 (S.D. Cal. 2023) ... 27

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ... 10, 11

*Federal Election Comm'n v. Cruz*,
596 U.S. 289 (2022) ... 1, 2

*Gabrielli v. Haleon US Inc.*,
2025 WL 2494368 (N.D. Cal. Aug. 29, 2025) ... *passim*

*Gabrielli v. Motorola Mobility LLC*,
2025 WL 1939957 (N.D. Cal. July 14, 2025) ... 14, 20, 21, 26

*Greenley v. Kochava, Inc.*,
684 F. Supp. 3d 1024 (S.D. Cal. 2023) ... *passim*

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ... 1, 2, 3

*Heeger v. Facebook, Inc.*,
509 F. Supp. 3d 1182 (N.D. Cal. 2020) ... 11

*Heiting v. FKA Distributing Co. LLC*,
2025 WL 1430663 (C.D. Cal. May 15, 2025) ... 14

*In re Certified Question of Law*,
858 F.3d 591 (FISCR 2016) ... 12

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1684 (2021) ... 10, 11, 20

*In re Google*,
2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) ... 5

*In re Google Assistant Privacy Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) ... 5

*In re Google RTB Consumer Privacy Litig.*,
606 F. Supp. 3d 935 (N.D. Cal. 2022) ... 7

*In re iPhone Application Litig.*,
844 F. Supp. 2d 1040 (N.D. Cal. 2012) .......... 17

*In re Meta Pixel Tax Filing Cases*,
- F. Supp. 3d -, 2025 WL 2243615 (N.D. Cal. Aug. 6, 2025) .......... *passim*

*In re Zynga Privacy Litig.*,
750 F.3d 1098 (9th Cir. 2014) .......... 18

*James v. Walt Disney Co.*,
701 F. Supp. 3d 942 (N.D. Cal. 2023) .......... 18

*Javier v. Assurance IQ, LLC*,
2021 WL 940319 (N.D. Cal. Mar. 9, 2021) .......... 5

*Javier v. Assurance IQ, LLC*,
649 F. Supp. 3d 891 (N.D. Cal. 2023) .......... 26

*Jones v. Ford Motor Co.*,
85 F.4th 570 (9th Cir. 2023) .......... 10

*Kentucky v. Yellen*,
54 F.4th 325 (6th Cir. 2022) .......... 2

*Langer v. Kiser*,
57 F.4th 1085 (9th Cir. 2023) .......... 1

*Laufer v. Naranda Hotels, LLC*,
60 F.4th 156 (4th Cir. 2023) .......... 2

*Legacy Health Sys. v. Hathi*,
2024 WL 2843034 (9th Cir. Cir. June 5, 2024) .......... 2

*Lesh v. Cable News Network, Inc.*,
2025 WL 563358 (S.D.N.Y. Feb. 20, 2025) .......... *passim*

*Lopez v. Apple, Inc.*,
519 F. Supp. 3d 672 (N.D. Cal. 2021) .......... 25

*Mirmalek v. Los Angeles Times Comms. LLC*,
2024 WL 5102709 (N.D. Cal. Dec. 12, 2024) .......... *passim*

*Moody v. C2 Educ. Systems Inc.*,
742 F. Supp. 3d 1072 (C.D. Cal. 2024) .......... 14, 21, 23, 26

*Popa v. Microsoft Corp.*,
- F.4th -, 2025 WL 2448824 (9th Cir. Aug. 26, 2025) ......................................11

*Revitch v. New Moosejaw, LLC*,
2019 WL 5485330 (N.D. Cal. Oct. 23, 2019) (Chhabria, J.) .............................26

*Riganian v. Liveramp Holdings, Inc.*,
- F. Supp. 3d -, 2025 WL 2021802 (N.D. Cal. July 18, 2025) ........ 14, 20, 21, 26

*Rodriguez v. Autotrader.com, Inc.*,
2025 WL 1085787 (C.D. Cal. Apr. 4, 2025) .......................................... 2, 3, 4, 5

*Rodriguez v. Autotrader.com, Inc.*,
762 F. Supp. 3d 921 (C.D. Cal. 2025) ........................................................14, 21

*Rojas v. City of Ocala, Fl.*,
40 F.4th 1347 (11th Cir. 2022) ..........................................................................2

*Shah v. Fandom, Inc.*,
754 F. Supp. 3d 924 (N.D. Cal. 2024)....................................................... *passim*

*Smith v. Albany Cty. Sch. Dist. No. 1 Bd. of Trustees*,
121 F.4th 1374 (10th Cir. 2024) ........................................................................2

*Smith v. Maryland*,
442 U.S. 735 (1979)..........................................................................................12

*Smith v. Pacific Properties and Dev. Corp.*,
358 F.3d 1097 (9th Cir. 2004) .......................................................................3, 4

*Stenson Tamaddon, LLC v. United States Internal Revenue Service*,
742 F. Supp. 3d 966 (D. Ariz. 2024) .................................................................2

*Stewart v. Kodiak Cakes, LLC*,
537 F. Supp. 3d 1103 (S.D. Cal. 2021)...............................................................8

*Taylor v. Salvation Army Nat'l Corp.*,
110 F.4th 1017 (7th Cir. 2024) ..........................................................................2

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)......................................................................... 4, 10, 17

*U.S. Dep't of Justice v. Reporters Comm. For Freedom of the Process*,
489 U.S. 749 (1989)..........................................................................................10

*United States v. Forrester*,
512 F.3d 500 (9th Cir. 2007) ........................................................ 11, 12, 13, 18

*United States v. Staves*,
383 F.3d 977 (9th Cir. 2004) ..............................................................4, 5

*Whittlestone, Inc. v. Handi-Craft Co.*,
618 F.3d 970 (9th Cir. 2010) ..................................................................27

*Zarif v. Hwareh.com, Inc.*,
2025 WL 486317 (S.D. Cal. Feb. 13, 2025)............................................ *passim*

*Zeichner v. Nord Security Inc.*,
2024 WL 4951261 (N.D. Cal. Dec. 2, 2024)...................................................8

**California Cases**

*Friddle v. Epstein*,
16 Cal. App. 4th 1649 (1993) .....................................................................3

*Hill v. National Collegiate Athletic Ass'n*,
7 Cal.4th 1 (1994) ........................................................................................6

*People v. Avery*,
27 Cal.4th 49 (2002) ..................................................................................26

*People v. Braden*,
14 Cal. 5th 791 (2023) ...............................................................................26

*People v. Guzman*,
11 Cal. App. 5th 184 (2017) ......................................................................26

*People v. Stipo*,
195 Cal. App. 4th 664 (2011) .....................................................................11

*Rattagan v. Uber Techs., Inc.*,
17 Cal.5th 1 (2024) ......................................................................................8

*Ribas v. Clark*,
38 Cal. 3d 355 (1985) ................................................................................10

*Sanders v. Am. Bd. Co., Inc.*,
20 Cal.4th 907 (1999) ..................................................................................5

*Shulman v. Group W Productions, Inc.*,
18 Cal.4th 200 (1998) ....................4, 5

**U.S. Constitution**

Article III ....................2, 4

First Amendment ....................2

**Federal Statutes**

42 U.S.C.
§ 3601 *et seq.* ....................3
§ 3604(a) ....................3
§ 3604(d) ....................3
§ 3604(f)(2) ....................3, 4
§ 12181 *et seq.* ....................3
§ 12182(a) ....................4
§ 12182(b)(1)(A)(iv) ....................3
§ 12188 ....................3
Americans with Disabilities Act ....................1, 3
Title III of the ADA ....................3
Fair Housing Act ....................3

Electronic Communications Privacy Act of 1986
§ 101, Pub. L. No. 99–508, 100 Stat 1848 (1986) .................... 12, 13, 20

Title III of the Omnibus Crime Control and Safe Street Act of 1968, Pub.
L. No. 90-351, 82 Stat. 197 (1968) .................... 12, 13, 17

Pen Register Act ....................13, 20

USA Patriot Act of 2001, Pub. L. No. 107–56
§ 216, 115 Stat. 272 (2001) ....................13, 20

**California Statutes**

Civil Code
§ 1798.100 *et seq.* ....................6

§ 1798.100(a) .......... 8
§ 1798.100(a)(1)-(3) .......... 8
§ 1798.100(b) .......... 8
§ 1798.140 .......... 7
§ 1798.140(v)(1)(A) .......... 6
§ 1798.140(v)(1)(F) .......... 6
§ 1798.140(v)(1)(G) .......... 6
§ 1798.140(ae)(1)(C) .......... 6
§ 1798.175 .......... 6
Invasion of Privacy Act .......... *passim*
Consumer Privacy Act of 2018 .......... *passim*

Penal Code
§ 4 .......... 26
§ 630 .......... 19
§ 631 .......... 17
§ 631(a) .......... 22, 24, 26, 27
§ 637.2 .......... 26
§ 637.2(a) .......... 3
§ 638.50 .......... 18, 19, 20, 21
§ 638.50(b) .......... *passim*
§ 638.50(c) .......... *passim*
§ 638.51 .......... *passim*
§ 638.51(a) .......... 23, 24, 25
§ 638.51(b) .......... 22, 23
§ 638.51(b)(1) .......... 25
§ 638.52 .......... 15, 19, 20
§ 1546 *et seq.* .......... 6
§ 1546(d) .......... 6
§ 1546(h) .......... 6
§ 1546.1(a)(1) .......... 6
§ 1546.1(b) .......... 6
§ 1546.4(a) .......... 6
Electronic Communications Privacy Act .......... 6, 11
Chapter 1.5 .......... 26

**California Regulations**

11 C.C.R.
§ 7000(a) .......... 8
§ 7001(q) .......... 8
§ 7012 .......... 8, 9

§ 7012(c) ....................................................................................................8
§ 7012(d) ....................................................................................................9

**Federal Rules**

Rule 12(f) ....................................................................................................27

**Other Authorities**

Assembly Committee on Public Safety Bill Analysis of June 21, 2010 for Senate Bill No. 1428 (2009-2010 Regular Session) ..........................................15

13A Charles A. Wright, Arthur R. Miller, and Edward H. Cooper, Fed. Prac. & Proc. Juris. (3d ed. June 2024 Update)
§ 3531.5.......................................................................................................1
n.61.............................................................................................................1
n.70.............................................................................................................1
n.73.............................................................................................................1

First Amended Compl. filed in *Greenley v. Kochava, Inc.*, No. 3:22-cv-01327-BAS-AHG, Doc. 10 (S.D. Cal.) ...........................................................16

Ira S. Rubenstein, *Privacy Localism*, 93 Wash. L. Rev. 1961 (2018).....................13

S. Freiwald, *Uncertain Privacy: Communication Attributes After the Digital Telephony Act*, 69 S. Cal. L. Review 949 (1996).............................12, 13

S. Rep. No. 90-1097, at 98 (1968), 1968 WL 4956, *reprinted in* 1968 U.S.C.C.A.N. 2112, 2187 (Apr. 29, 1968) .......................................................13

Senate Committee on Public Safety Bill Analysis of Apr. 12, 2010 for Senate Bill No. 1428 (2009-2010 Regular Session) at 2, 6, 7, 9) ......................15

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. ARGUMENT

### A. Plaintiff Has Standing to Sue.

#### 1. Plaintiff Can Have Standing Even as a "Tester".

Although Defendant argues that Plaintiff, a "tester," cannot have standing to sue because she suffered a self-inflicted injury, (Def.'s Mem. at 11:14-12:13), a well-recognized treatise on federal practice has explained, "Self-inflicted injury may seem a suspicious basis for standing. It is clear, however, that no rigid lines are drawn on this basis." 13A Charles A. Wright, Arthur R. Miller, and Edward H. Cooper, Fed. Prac. & Proc. Juris. § 3531.5 (3d ed. June 2024 Update) ("Wright, Miller & Cooper"). That treatise further explained, "Standing is not defeated merely because the plaintiff has in some sense contributed to his own injury." *Id.* § 3531.5 & n.70. "A self-inflicted injury defeats standing only if the injury is ***so completely due to the plaintiff's fault as to break the causal chain***." *Id.* at n.70 (emphasis added) (citation omitted); *id.* at n.73 ("Standing is defeated only if it is concluded that the injury is ***so completely due to the plaintiff's own fault as to break the causal chain***.") (emphasis added).

Such treatise cited in support as illustrative the U.S. Supreme Court's landmark decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373-74 (1982). Wright, Miller & Cooper, *supra*, § 3531.5 & n.61; *Civil Rights Educ. and Enforcement Center v. Hospitality Props. Trust*, 867 F.3d 1093, 1101-02 (9th Cir. 2017) ("*CREEC*") (citing *Havens*), *cited in Langer v. Kiser*, 57 F.4th 1085, 1094 (9th Cir. 2023) (holding that the fact that the plaintiff is a "serial litigant" "has no place in our standing analysis"); *id.* at 1096 (holding that "a plaintiff has constitutional standing" even if "her only motivation for visiting a facility is to test it for ADA compliance"). *Havens* continues to be recognized as supporting tester standing even by the Supreme Court itself. *See Federal Election Comm'n v. Cruz*, 596 U.S. 289, 296-97 (2022) (citing *Havens*) (rejecting the recognition of an exception to traceability for injuries that a party purposely incurs).

In *Cruz*, the Government argued that Senator Ted Cruz and other plaintiffs lacked

"standing because their injuries were 'self-inflicted,'"[1] *id.* at 296, and asked the Supreme Court "to recognize an exception to traceability for injuries that a party purposely incurs," *id.*, but the Supreme Court unequivocally rejected such challenge:

> "We have never recognized a rule of this kind under Article III. To the contrary, ***we have made clear that an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred***."

*Id.* at 297 (emphasis added) (citing *Havens*, 455 U.S. at 374). Numerous federal circuit courts including the Ninth Circuit have followed *Cruz* for such proposition. *Legacy Health Sys. v. Hathi*, 2024 WL 2843034, at *1 (9th Cir. Cir. June 5, 2024) (citing *Cruz*).[2]

*California v. Azar*, 911 F.3d 558, 573-74 (9th Cir. 2018), also supports Plaintiff's position. *California v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 2023 WL 1873087, at *10 (N.D. Cal. Feb. 9, 2023) (characterizing *Azar* as concluding that California had standing to sue because "even though one could have argued that the state contributed to its own injury, the state was not so ***solely at fault*** that it was proper to deem the injury self-inflicted") (emphasis added).

*Rodriguez v. Autotrader.com, Inc.*, 2025 WL 1085787, at *1-*2 (C.D. Cal. Apr. 4, 2025), is both distinguishable and is unpersuasive. First, although *Autotrader.com* purported to distinguish *Cruz* as a "First Amendment" case, 2025 WL 1085787, at *1, it failed to consider *Azar*.

Second, although *Autotrader.com* purported to distinguish *CREEC* as involving

[1] Senator Cruz and his campaign both stipulated that their "sole and exclusive motivation" for violating the campaign-finance restriction in federal law was to create a factual basis for challenging such restriction under the First Amendment. 596 U.S. at 296.

[2] *See, e.g.*, *Smith v. Albany Cty. Sch. Dist. No. 1 Bd. of Trustees*, 121 F.4th 1374, 1378 (10th Cir. 2024); *Taylor v. Salvation Army Nat'l Corp.*, 110 F.4th 1017, 1025 (7th Cir. 2024); *Consumers' Research v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 351 (5th Cir. 2024); *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 170-171 (4th Cir. 2023); *Commonwealth v. Biden*, 57 F.4th 545, 555-56 (6th Cir. 2023); *Kentucky v. Yellen*, 54 F.4th 325, 345-46 (6th Cir. 2022); *Rojas v. City of Ocala, Fl.*, 40 F.4th 1347, 1351 (11th Cir. 2022); *Stenson Tamaddon, LLC v. United States Internal Revenue Service*, 742 F. Supp. 3d 966, 982-83 (D. Ariz. 2024).

"ADA claims," it failed to recognize that invasion of privacy and civil rights claims both implicate harm to a dignitary interest. *Friddle v. Epstein*, 16 Cal. App. 4th 1649, 1660-61 (1993) ("Any invasion of privacy involves an affront to human dignity"); *Bayer v. Neiman Marcus Group, Inc.*, 861 F.3d 853, 874 (9th Cir. 2017) (recognizing "the dignitary interest at stake when an action alleges a violation of a statute intended to safeguard civil rights").

Third, *Autotrader.com* failed to recognize that the reason why *CREEC*, which involved a claim under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*, followed *Havens*, the latter of which involved a claim under the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, is because both statutes used identical language to describe who had standing to sue, which was "any person." *CREEC* noted that "the ADA's enforcement provision, [42 U.S.C.] § 12188, provides that ' '*any person* who is being subjected to discrimination on the basis of disability' may bring suit,' exactly tracking the 'any person' language of *Havens Realty* [in 42 U.S.C. § 3604(d)]." 867 F.3d at 1101-02 (emphasis in original). Likewise, the "[a]ny person" language in section 637.2(a) of the Penal Code "exactly track[s] the 'any person' language of *Havens Realty*" too.

Significantly, the "absence of limiting language" "limit[ing] standing to sue under discrimination statutes to certain groups of people" such as persons who make a "bona fide offer" to rent or purchase a dwelling under the FHA, 42 U.S.C. § 3604(a), or "clients or customers of the covered public accommodation," 42 U.S.C. § 12182(b)(1)(A)(iv) under Title III of the ADA, was crucial to the outcomes in both *Havens* and *CREEC*. *CREEC*, 867 F.3d at 1101-02.

Indeed, in *CREEC*, the Ninth Circuit cited with approval *Smith v. Pacific Properties and Dev. Corp.*, 358 F.3d 1097, 1102-04 (9th Cir. 2004), the latter of which involved a different provision of the FHA, 42 U.S.C. § 3604(f)(2), than what was addressed at *Havens*. *CREEC*, 867 F.3d at 1101. *Smith* held that "[t]he district court … erred as a matter of law in interpreting § 3604(f)(2) to preclude tester standing." 358 F.3d at 1104. *Smith* reasoned that § 3604(f)(2) was not limited to bona fide purchasers based on its

language. 358 F.3d at 1103-04; 42 U.S.C. § 3604(f)(2) ("it shall be unlawful … [t]o discriminate against ***any person*** in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of--(A) that person.") (emphasis added).

Thus, *Autotrader.com* engaged in a superficial analysis of *CREEC* by ignoring the "absence of limiting language" in the relevant statutes analyzed therein including 42 U.S.C. § 12182(a) ("***[n]o individual*** shall be discriminated against on the basis of disability") (emphasis added).

Fourth, although *Autotrader.com* cited in support *Byars v. Sterling Jewelers, Inc.*, 2023 WL 2996686, at *4 (C.D. Cal. Apr. 5, 2023) ("*Sterling Jewelers I*"), such latter decision expressly stated that with respect to the court's Article III standing analysis, "the Court's analysis does not depend on Plaintiff's status as a tester[.]"[3] *Id.* at *4 n.3.

Fifth, *Autotrader.com* failed to recognize that the reasonable expectation of privacy legal standard is ***objective***, not subjective under California law. *Shulman v. Group W Productions, Inc.*, 18 Cal.4th 200, 232 (1998) (holding that the tort of intrusion into private places, conversations or matter "is proven only if the plaintiff had an ***objectively*** reasonable expectation of seclusion or solitude in the place, conversation or data source") (emphasis added). Thus, *Autotrader.com* erred by applying a ***subjective*** standard to the plaintiff therein.

Sixth, *Autotrader.com* failed to address or distinguish *United States v. Staves*, 383 F.3d 977, 981 (9th Cir. 2004) ("***foreseeability of monitoring is insufficient to infer***

---

[3] The court in *Sterling Jewelers I* also subsequently abandoned reliance upon the defendant's facial challenge after the plaintiff therein moved for reconsideration and relied upon *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1118-19 (9th Cir. 2020), which held that a statutory violation of CIPA would satisfy the concrete injury requirement for Article III standing. (Doc. 46 at 9:1-3 in No. 5:22-cv-01456-SB-SP (C.D. Cal. Apr. 20, 2023).) The court instead relied solely upon the defendant's factual challenge in a subsequent order denying such motion for reconsideration that was limited to its unique facts. *Byars v. Sterling Jewelers, Inc.*, 2023 WL 4195768, at *4 (C.D. Cal. May 18, 2023) ("the Court need not decide whether *Campbell* states the absolute rule advanced by Plaintiff or whether such a rule survives *TransUnion*") ("Because Plaintiff has not shown that dismissal based on Zale's factual challenge constituted manifest error of law or fact, it is immaterial whether Zale's facial challenge presented an independent basis for dismissal."). *Sterling Jewelers I* should be limited to its unique facts at issue therein.

***consent***”) (emphasis added); *In re Google*, 2013 WL 5423918, at *12 (N.D. Cal. Sept. 26, 2013) (“That the person communicating knows that the interceptor has the *capacity* to monitor the communication is insufficient to establish implied consent.”) (emphasis in original); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 932 (N.D. Cal. 2024) (“A user who consents to disclose their IP address to Fandom as part of accessing its website does not necessarily consent to disclose their IP address to the third parties operating the Trackers.”). Thus, *Autotrader.com* conflicts with Ninth Circuit precedent.

Seventh, *Autotrader.com* implicitly found implied consent to the wrongdoing alleged therein without recognizing that “[t]he critical question with respect to implied consent is whether the parties whose communications were intercepted had ***adequate notice*** of the interception.” *In re Google*, 2013 WL 5423918, at *12 (emphasis added).

Finally, *Autotrader.com* failed to recognize that “‘[c]onsent is … generally limited to the specific conduct authorized.’” *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1048 (S.D. Cal. 2023) (quoting *Javier v. Assurance IQ, LLC*, 2021 WL 940319, at *2 (N.D. Cal. Mar. 9, 2021)); *Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836, 847 (N.D. Cal. 2014) (no consent to data being used for targeted advertising where users consented to its use for “data analysis”); *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 824 (N.D. Cal. 2020) (consent to data collection does not extend to data disclosure). As the California Supreme Court has explained:

> “[W]e adhere to the view suggested in *Shulman v. Group W Productions, Inc.*, 18 Cal.4th 200 (1998)]: privacy … is not a binary, all-or-nothing characteristic. There are degrees and nuances to societal recognition of our expectations of privacy: the fact that the privacy one expects in a given setting is not complete or absolute does not render the expectation unreasonable as a matter of law.”

*Sanders v. Am. Bd. Co., Inc.*, 20 Cal.4th 907, 915-16 (1999) (recognizing an “expectation of limited privacy”); *Javier*, 2021 WL 940319, at *2 (“[C]onsent ‘is not an all-or-nothing proposition.’”) (quoting *In re Google*, 2013 WL 5423918, at *12).

### 2. Identifiers Such as An IP Address and Geolocation Data and Browsing History Constitute a Consumer's Personal Information in California as Recognized by California Statutes, Which Support a Reasonable Expectation of Privacy.

Defendant's contention that Plaintiff lacked a reasonable expectation of privacy is wrong.[4] Over the past decade, California law has expressly recognized a legally protected privacy interest in IP addresses. For example, in 2015, California's Legislature enacted California's Electronic Communications Privacy Act ("CECPA"), Cal. Penal Code § 1546 *et seq.*, which precludes the government from compelling internet service providers to provide a user's IP addresses without a warrant or other limited exception. (Penal Code §§ 1546(d) & (h), 1546.1(a)(1) & (b), 1546.4(a) (2015) (stating that government's violation of CECPA by compelling production of or access to IP address of individual or device participating in electronic communication without warrant or other limited exception can result in suppression of evidence at trial).

More recently, in 2018, the California Legislature enacted into law the California Consumer Privacy Act of 2018 ("CCPA"), Cal. Civil Code § 1798.100 *et seq.*,[5] which recognizes that "[i]dentifiers such as a[n] Internet Protocol address," "Geolocation data,"[6] and "Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a consumer's interaction with an internet website application, or advertisement," all constitute a consumer's "personal information," (Civ. Code § 1798.140(v)(1)(A), (F), (G)). The CCPA's recognition supports a reasonable expectation of privacy in such personal information.

---

[4] It is well established that a reasonable expectation of privacy is a concept derived from the common law. *Hill v. National Collegiate Athletic Ass'n*, 7 Cal.4th 1, 27 (1994) (referring to "the common law's insistence on objectively reasonable expectations of privacy"). It is not a required element of the ***statutory*** cause of action at issue herein for violation of section 638.51.

[5] Notably, the CCPA does not preempt CIPA. *Mirmalek v. Los Angeles Times Comms. LLC*, 2024 WL 5102709, at *5 (N.D. Cal. Dec. 12, 2024) (citing Cal. Civ. Code § 1798.175) ("the provisions of the law that afford the greatest protection for the right of privacy for consumers shall control").

[6] "A consumer's precise geolocation" constitutes "Sensitive personal information" under the CCPA. (Civ. Code § 1798.140(ae)(1)(C).)

*See In re Google RTB Consumer Privacy Litig.*, 606 F. Supp. 3d 935, 946-47 (N.D. Cal. 2022) ("plaintiffs allege that Google sells sensitive personal information ***such as plaintiff's IP address***….Google argues that such information is routinely shared and thus cannot support a reasonable expectation of privacy. Not so. First, ***such information is personal information under California law and parties generally maintain a reasonable expectation in their personal information***.") (emphasis added) (citing Civ. Code § 1798.140); *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1077-79 (N.D. Cal. 2021) (allegations that Google collected a "profile of users" "collected secretly … without any notice to users" via "fingerprinting techniques, system data, and geolocation data" sufficient to plead a reasonable expectation of privacy because "users' Internet activity" "may reveal" "a user's private plans for the future (e.g., purchasing of an engagement ring)" and plaintiffs "could have reasonably assumed that defendant "could have reasonably assumed that Google would not receive their data … based on Google's representations").

The defendant's representations in *Brown* that led the plaintiffs therein to believe that they could manage their privacy, *Brown*, 525 F. Supp. 3d at 1078, are no different than the misleading consent management platform ("CMP") at issue herein. (Ferrell Decl. ¶ 2 & Ex. 1.)

**3. The Website Has Embedded First-Party Cookies of Multiple Third Parties to Surveil Users of the Website.**

The website at: https://www.lennar.com/ (the "Website") has embedded the software code of multiple third parties. (Ferrell Decl. ¶ 2 & Ex. 1.) Plaintiff's investigation has determined that Defendant has partnered with multiple third party spyware software developers to collect ***personal information*** from Website users via software code embedded into the Website including Optimizely and Cloudfare. *Id.*

The reason why such entities have embedded their code on the Website so that their first-party cookies are downloaded onto the devices and browsers of Website visitors and stored there is because they are harvesting visitor data, building profiles of consumers,

and monetizing "segmented" audiences via targeted advertising and marketing campaigns. Indeed, Defendant's current Privacy Policy acknowledges that the Website collects "Internet Usage Data" including browsing history via "cookies, pixels, web beacons, tags and other tracking technologies," which "enables targeted advertising." https://www.lennar.com/privacypolicy (last visited Sept. 26, 2025); Ferrell Decl. ¶ 3 & Ex. 2.

"A duty to disclose a material fact can arise if … it is imposed by statute…." *Zeichner v. Nord Security Inc.*, 2024 WL 4951261, at *6 (N.D. Cal. Dec. 2, 2024) (quoting *Rattagan v. Uber Techs., Inc.*, 17 Cal.5th 1, 40 (2024)). Here, the CCPA and its regulations imposed upon Defendant a statutory duty to disclose material facts about its collection of personal information from California consumers who used the Website to avoid misleading such consumers about the nature of its personal information collection practices on the Website in March 2023[7] (during Plaintiff's visit to the Website). Defendant was required to provide a "Notice at Collection" of personal information in compliance with the CCPA, (Cal. Civ. Code § 1798.100(a)(1)-(3)), and California's regulation at 11 C.C.R. § 7012 at that time, which are part of the California Consumer Privacy Act Regulations. 11 C.C.R. § 7000(a). Such Regulations define "Notice at Collection" to mean "the notice given by a business to a consumer at or before the point at which a business collects personal information from the consumer as required by Civil Code section 1798.100, subdivisions (a) and (b), and specified in these regulations." 11 C.C.R. § 7001(q).

Section 7012 provides, "The Notice at Collection shall be made readily available where consumers will encounter it at or before the point of collection of any personal information." 11 C.C.R. § 7012(c). Such regulation provides an "[i]llustrative example" as follows: "When a business collects consumers' personal information online, it may post a conspicuous link to the notice on the introductory page of the business's website

[7] Defendant's contention that the FAC must do more than identify the year of Plaintiff's visit, (Def.'s Mem. at 20:15-22), is misplaced. *Stewart v. Kodiak Cakes, LLC*, 537 F. Supp. 3d 1103, 1133-34 (S.D. Cal. 2021).

and on all webpages where personal information is collected." 11 C.C.R. § 7012(c)(1). Section 7012 provides, "If a business does not give the Notice at Collection to the consumer at or before the point of collection of their personal information, the business shall not collect personal information from the consumer." 11 C.C.R. § 7012(d).

In March 2023, Plaintiff visited the Website and used its chat feature to communicate with Defendant. (FAC ¶ 6.) At the time of Plaintiff's use, there was no cookie banner otherwise known as a CMP displayed at the outset of her visit to the Website notifying Plaintiff about what categories of cookies would be attached to Plaintiff's browser and computer device resulting from her use of the Website. The Website added a CMP after Defendant received Plaintiff's counsel's pre-filing demand letter dated May 22, 2023. Indeed, Defendant added its cookie banner with a CMP powered by OneTrust in August 2023. (Ferrell Decl. Ex. 1.) And, Defendant revised its Terms and Conditions on September 5, 2023, after receiving Plaintiff's "pre-litigation demand letter to Lennar in May of 2023." (Boone Decl. of 1/5/24 ¶ 3; Doc. 12-1.)

Defendant failed to provide a Notice at Collection in accordance with the CCPA during Plaintiff's March 2023 visit. Such violations of the CCPA constitute material omissions by Defendant arising from a statutorily-prescribed duty. During Plaintiff's visit to the Website, third party cookies began to surreptitiously collect information about Plaintiff's device and Plaintiff's interactions with the Website the moment that Plaintiff landed on the Website. Because of the absence of a "Notice at Collection" on the homepage of the Website during her visit, as a California resident, Plaintiff reasonably relied upon the absence of such Notice at Collection to indicate that the Website was not collecting, using, or sharing Plaintiff's personal information with any third parties during such visit. This affected Plaintiff's use of the Website both in terms of her browsing history and use of the chat feature. Unbeknownst to her, Plaintiff's use of the chat feature and browsing history were recorded by cookies and shared with third-party cookie developers whose cookies and spyware were embedded onto the Website and downloaded onto Plaintiff's device and browser upon her visiting the Website.

Although Defendant has subsequently installed a CMP purporting to provide users of its Website with the purported ability to reject non-essential cookies such as targeting cookies, performance cookies, and functional cookies, Plaintiff's investigation has determined that ***the Website is misconfigured to allow such non-essential first-party cookies to function despite the user's selection***. (Ferrell Decl. ¶ 2 & Ex. 1.) Thus, such CMP is misleading to consumers who visit the Website.

Defendant's violation of its statutory obligation to disclose its personal information gathering practices via a Notice at Collection is highly offensive to a reasonable person, which supports Plaintiff's position that she was harmed by Defendant's conduct, which deprived her of the ability to control personal information regarding her digital activity and profile, which federal courts have treated as enough to show a concrete injury to a right to privacy. *Ribas v. Clark*, 38 Cal. 3d 355, 360 (1985) ("secret monitoring [of telephone calls] denies the speaker an important aspect of privacy of communication –the right to control the nature and extent of firsthand dissemination of his statements"); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 598 (9th Cir. 2020) (holding that "[a] right to privacy 'encompass[es] the individual's control of information concerning his or her person'") (quoting *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) (quoting *U.S. Dep't of Justice v. Reporters Comm. For Freedom of the Process*, 489 U.S. 749, 763 (1989)), *cert. denied*, 141 S. Ct. 1684 (2021); *Eichenberger*, 876 F.3d at 983 ("the Supreme Court has noted that 'both the common law and the literal understanding of privacy encompass the individual's control of information concerning his or her person"); *Jones v. Ford Motor Co.*, 85 F.4th 570, 574 (9th Cir. 2023) ("With respect to constitutional injury-in-fact, the relevant law is settled. A statute that codifies a common law privacy right 'gives rise to a concrete injury sufficient to confer standing.' And this court has consistently found that '[v]iolations of the right to privacy have long been actionable at common law.'") (internal citation omitted); *Gabrielli v. Haleon US Inc.*, 2025 WL 2494368, at *5-*8 (N.D. Cal. Aug. 29, 2025) ("The Ninth Circuit has not disavowed *Facebook* in the wake of *TransUnion*.").

To the extent that Defendant relies upon *Popa v. Microsoft Corp.*, - F.4th - , 2025 WL 2448824 (9th Cir. Aug. 26, 2025), in its Reply to argue that Plaintiff lacks standing to sue, *Popa* is distinguishable for the same reasons explained in *Haleon*. For example, the plaintiff in *Popa* "did not challenge the storage and/or transmission of cookies…." *Haleon*, 2025 WL 2494368, at *7. Thus, the nature of the privacy invasion was far more serious therein just as it is serious here unlike in *Popa*.

And, *Popa* conflicts with Ninth Circuit precedent recognizing that the right to privacy dating back to the common law encompasses "the individual's control of information concerning his or her person" such as "an individual's likes, dislikes, interests, and habits" without imposing a confidential information requirement. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 598; *Eichenberger*, 876 F.3d at 983.

**4. The Decisions Cited by Defendant Are Distinguishable.**

Defendant's reliance on *United States v. Forrester*, 512 F.3d 500, 519 (9th Cir. 2007), is misplaced as *Forrester* is distinguishable for many reasons. First, *Forrester* had no occasion to consider whether an Internet user has a reasonable expectation of privacy as to the user's IP addresses on the user's devices.

Second, *Forrester* was decided in 2008, well before the CECPA and CCPA were enacted into law.[8]

Third, *Forrester* treated the "IP addresses of websites visited," as "unprotected addressing information," 512 F.3d at 510, because the Ninth Circuit viewed the "IP addresses of websites visited," as irrelevant to "know[ing] the particular pages on the websites the person viewed." *Id.* at 510. If the government could "know the particular pages on the websites the person viewed" by learning the "IP addresses of websites visited," then the outcome in *Forrester* may have been different. *Id.* at 510 n.6.

Fourth, *Forrester* was decided more than 15 years ago, before the identity resolution industry existed and before tracking software embedded into websites as

[8] Defendant's reliance upon *People v. Stipo*, 195 Cal. App. 4th 664, 669 (2011), is equally misplaced for this same reason. *Heeger v. Facebook, Inc.*, 509 F. Supp. 3d 1182, 1190 (N.D. Cal. 2020), similarly failed to consider the CECPA or CCPA in its analysis.

"cookies" to track the specific webpages visited by Internet users became technically feasible amongst websites. Given that it is currently technically feasible to track the specific webpages visited by Internet users via tracking software code embedded into websites by learning the users' IP addresses on their computerized devices, *Forrester* is predicated upon outdated assumptions about computer technology, which is precisely why the Legislature enacted the CCPA and indicated that users' IP address constitutes personal information.

Finally, *Forrester* relied heavily upon *Smith v. Maryland*, 442 U.S. 735 (1979). *Forrester*, 512 F.3d at 509-10. *Smith* narrowly defined a "pen register" in relevant part as "a ***mechanical device*** that records the numbers dialed on a telephone by monitoring the electrical impulses caused when the dial on the telephone is released." 442 U.S. at 736 n.1 (emphasis added). As a law review article points out, however, *Smith* relied upon a definition of a "pen register" that was later significantly modified by the enactment of the Electronic Communications Privacy Act of 1986 ("ECPA"), § 101, Pub. L. No. 99–508, 100 Stat 1848 (1986), which amended Title III of the Omnibus Crime Control and Safe Street Act of 1968, Pub. L. No. 90-351, 82 Stat. 197 (1968) ("Wiretap Act").[9] S. Freiwald, *Uncertain Privacy: Communication Attributes After the Digital Telephony Act*, 69 S. Cal. L. Review 949, 985 (1996). Significantly, such 1986 enactment "omitted the Supreme Court's reference to the 'mechanical' nature of the pen register device, and it did not limit the pen register to something that acquired information about a telephone…." *Id.* The "final version of the ECPA omitted references to 'wire communications' that likely would have limited the use of pen registers to the interception of the numbers dialed in traditional telephone conversations." *Id.* "The ECPA's pen register could capture 'other impulses'

[9] "Prior to 1986, there was no federal statute that governed the use of pen registers and trap-and-trace devices.…Title III [of the Wiretap Act] was silent … as to the use of pen registers or other devices that could intercept non-content information.…In *Smith*…, … the Court held that pen registers…could be installed and operated without the need for a court order. In 1986, Congress changed that regime with the enactment of the [ECPA]. That statute added a provision authorizing the government to install and use pen registers and trap-and-trace devices, but only upon obtaining a court order." *In re Certified Question of Law*, 858 F.3d 591, 600-01 (FISCR 2016).

besides electronic impulses and did not necessarily produce a paper record." *Id.* "The broadly worded ECPA pen register definition was clearly designed to handle the electronic communications that the ECPA brought under legislative protection." *Id.* Significantly, the ECPA "***omitt[ed] language limiting the types of information a pen register could acquire***." *Id.* (emphasis added). Indeed, even at the time that such law review article was published in 1996, courts had already "regarded as pen registers devices that incorporate computer hardware and software." *Id.* at 987 & n.183 (citing cases). The subsequent enactment of the federal USA Patriot Act of 2001 ("Patriot Act"), Pub. L. No. 107–56, § 216, 115 Stat. 272 (2001), further modified the "pen register" definition to cover software processes that collect information.[10]

Thus, *Smith* was decided before any federal statute governed the use of pen registers and trap-and-trace devices and several decades before the Patriot Act was enacted into federal law on October 26, 2001. Notably, *Forrester* considered the "pre-October 2001 version of the pen register statute" because the surveillance at issue took place in May-July 2001. *Forrester*, 512 F.3d at 512 & n.7. Thus, *Forrester* did not consider the effect of the Patriot Act's amendment to the "pen register" definition on its decision. Nor did *Forrester* recognize that the version of the "pen register" definition in the ECPA applicable to that appeal had significantly changed from the version of the definition considered decades earlier by the Supreme Court in *Smith* before any federal statute governed the use of pen registers and trap-and-trace devices.

### B. The FAC Sufficiently Alleges a Violation of Section 638.51 of the Penal Code.

#### 1. Numerous Federal District Courts Have Recognized that Similar

[10] The reason why the federal Pen Register Act and CIPA's pen register and trap and trace device provisions are so similar is because the Pen Register Act sets a "floor," *i.e.*, a minimum standard that states can exceed with more stricter privacy laws, but they cannot enact "less restrictive legislation" as confirmed by the Wiretap Act's legislative history. Ira S. Rubenstein, *Privacy Localism*, 93 Wash. L. Rev. 1961, 2032 & n.427 (2018) (citing S. Rep. No. 90-1097, at 98 (1968), 1968 WL 4956, *reprinted in* 1968 U.S.C.C.A.N. 2112, 2187 (Apr. 29, 1968)). Thus, because the Patriot Act amended the "pen register" and "trap and trace device" definitions to cover software processes that collect information, California could not enact "less restrictive legislation" on this same topic.

**Third-Party Spyware Is Either a "Pen Register" or a "Trap and Trace Device".**

In recent years, there are currently at least ***thirteen*** different federal district court decisions that have comprehensively explained that third-party tracking software like what is alleged in the FAC can constitute either a pen register or a trap and trace device under § 638.51 of the Penal Code. *See, e.g., Haleon*, 2025 WL 2494368, at *4-*8, *11-*12; *In re Meta Pixel Tax Filing Cases*, - F. Supp. 3d -, 2025 WL 2243615, at *2-*6 (N.D. Cal. Aug. 6, 2025); *Riganian v. Liveramp Holdings, Inc.*, - F. Supp. 3d -, 2025 WL 2021802, at *11-*12 (N.D. Cal. July 18, 2025); *Gabrielli v. Motorola Mobility LLC*, 2025 WL 1939957, at *11-*12 (N.D. Cal. July 14, 2025); *Heiting v. FKA Distributing Co. LLC*, 2025 WL 1430663, at *2 (C.D. Cal. May 15, 2025); *Conohan v. Rad Power Bikes Inc.*, 2025 WL 1111246, at *6-*7 (C.D. Cal. Apr. 3, 2025); *Lesh v. Cable News Network, Inc.*, 2025 WL 563358, at *3-*7 (S.D.N.Y. Feb. 20, 2025); *Zarif v. Hwareh.com, Inc.*, 2025 WL 486317, at *11-*12 (S.D. Cal. Feb. 13, 2025); *Rodriguez v. Autotrader.com, Inc.*, 762 F. Supp. 3d 921, 929-30 (C.D. Cal. 2025); *Mirmalek*, 2024 WL 5102709, at *3-*5; *Shah*, 754 F. Supp. 3d at 928-33; *Moody v. C2 Educ. Systems Inc.*, 742 F. Supp. 3d 1072, 1076 (C.D. Cal. 2024); *Greenley*, 684 F. Supp. 3d at 1050.

**2. The FAC Should Be Liberally Construed.**

The FAC should be liberally construed as alleging that third-party software deployed on the Website is either: (i) a "device or process" that "records or decodes" "routing, addressing, or signaling information" "transmitted by an instrument or facility from which a[n] … electronic communication is transmitted, but not the contents of a communication," within the meaning of section 638.50(b) of the Penal Code; or (ii) a "device or process" that "captures" "the incoming electronic … impulses that identify the" "routing, addressing, or signaling information" "reasonably likely to identify the source of a[n] … electronic communication,"[11] within the meaning of section 638.50(c),

[11] The Legislature's intent to broadly define the meaning of "electronic communication," which is a crucial term used within the definitions of "pen register" and "trap and trace

Continued on the next page

by collecting the IP addresses of user devices and other identifying information used to analyze how Plaintiff and other Website users interact with the Website. (FAC ¶¶ 31-45; *id.* at 2:11-14.)

**3. The Website's Spyware Qualifies as a "Device or Process" Because It Constitutes "Software that Identifies Consumers, Gathers Data, and Correlates that Data."**

In *Greenley*, *supra*, the federal court explained:

> "***Today, pen registers take the form of software***. As a result, private companies and persons have the ability to hack into a person's telephone and gather the same information as law enforcement. Perhaps for this reason, ***the California legislature does not limit its prohibition on installing pen registers to law enforcement***. *Compare* Cal. Penal Code § 638.51 ("[A] *person* may not install or use a pen register ..." (emphasis added)), *with id.* § 638.52 ("A *peace officer* may make an application to a magistrate for an order ... authorizing ... the installation and use of a pen register ..." (emphasis added))."

684 F. Supp. 3d at 1050 (first and second emphasis added). *Greenley* added:

> "Moreover, the Court cannot ignore the expansive language in the California Legislature's chosen definition. The definition is specific as to the type of data a pen register collects—'dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted,' but it is vague and inclusive as to the form of the collection tool—'a device or process.' *See* Cal. Penal Code § [6]38.50(b). ***This indicates courts should focus less on the form of the data collector and more on the result***. Thus, the Court applies the plain meaning of a 'process' to the statute. A process can take many forms. ***Surely among them is software that identifies***

---

device" in Penal Code § 638.50(b) & (c), is clear from relevant legislative history. (Senate Committee on Public Safety Bill Analysis of Apr. 12, 2010 for Senate Bill No. 1428 (2009-2010 Regular Session) at 2, 6, 7, 9); RJN Ex. 1; (Assembly Committee on Public Safety Bill Analysis of June 21, 2010 for Senate Bill No. 1428 (2009-2010 Regular Session) at 6); RJN Ex. 2.

> ***consumers, gathers data, and correlates that data through unique 'fingerprinting.'***…***Thus, the Court rejects the contention that a private company's surreptitiously embedded software installed in a telephone cannot constitute a 'pen register.'***'"

*Id*. (emphasis added). Thus, as mentioned above, *Greenley*, in analyzing what constitutes a "process" within the meaning of subdivisions (b) and (c) of section 638.50 of the Penal Code, stated:

> "A process can take many forms. ***Surely among them is software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'***'"

*Greenley*, 684 F. Supp. 3d at 1050 (emphasis added). Indeed, in *Greenley*, the defendant's software developer kits ("SDKs") intended for use in third-party software applications for the defendant's corporate clients such as Airbnb, Disney, and Kroger allegedly collected the IP address of app users as well as other user data. Although *Greenley* does not expressly address the collection of IP addresses in addressing the allegations of the first amended complaint at issue therein, a review of the first amended complaint filed in *Greenley* clearly shows the existence of such allegation as follows:

> "This data collection includes all sorts of website information, as well as Plaintiffs' and Class Members' respective ***IP addresses***, browser and device information, user IDs, geolocation data, and other data, [and] are used by Defendant to 'fingerprint' individuals across the internet for Defendant's benefit, deriving revenue from the targeted marketing and sale of this information to third parties."

(First Amended Compl. filed in *Greenley v. Kochava, Inc.*, No. 3:22-cv-01327-BAS-AHG, Doc. 10 at ¶ 77; Pg. 24 of 55 (S.D. Cal.)) (emphasis added); RJN Ex. 3. Thus, *Greenley*'s reference to software constituting a "process" within the meaning of subdivisions (b) and (c) of section 638.50 of the Penal Code that "identifies consumers," "gathers data" and "correlates that data through unique 'fingerprinting,'" is intended to refer to a ***combination*** of IP addresses ***and other user data*** in order to "fingerprint"

individuals across the internet. Four other federal court decisions expressly agree with *Greenley* that software can be a "process" if it identifies consumers, gathers data, and correlates that data. *Lesh*, 2025 WL 563358, at *3 (quoting *Greenley*); *Zarif*, 2025 WL 486317, at *12 (quoting *Greenley*); *Mirmalek*, 2024 WL 5102709, at *3 (quoting *Greenley* and *Shah*); *Shah*, 754 F. Supp. 3d at 928 (quoting *Greenley*).

That is precisely what the FAC in the instant action alleges. (FAC ¶¶ 31-45; *id.* at 2:11-14.) The FAC's allegations allege that third party spyware on the Website engages in unique "fingerprinting" to de-anonymize visitors to the Website. (FAC ¶¶ 41-45.) Thus, the FAC alleges that users are tracked while visiting the Website, which can include when a user views the page, page interactions, and, of course, the identification of Website visitors. *Id.* at 2:11-14.

The Court can and should also infer from the FAC's allegations about the installation of tracking code on Plaintiff's Internet browser that the FAC's allegations allege that the Website's spyware can geolocate[12] users of the Website who are from California as reflected by such users' IP addresses. (FAC ¶ 10.)

For example, the FAC expressly identifies two particular third-party software developers, HotJar and ATData, whose software is embedded onto the Website. (FAC ¶¶ 41-44.) What can be gleaned from the FAC is that such specific spyware gathers visitor information about their devices including the IP address to determine other information such as geolocation data in order to segment users for targeted advertising. Thus, the FAC alleges substantial "downstream consequences" arising from Defendant's capturing of the IP address of Plaintiff's computerized device while visiting the Website. *TransUnion*, 594 U.S. at 442.

---

[12] As noted by *Greenley*, "courts have found that … the geolocation of the communicating parties are not the 'contents' of a communication under Section 631." *Greenley*, 684 F. Supp. 3d at 1051 (citing *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1061 (N.D. Cal. 2012) (finding that mere geolocation data is not the "contents" of a communication under the federal Wiretap Act). *Greenley* involved, *inter alia*, the collection of geolocation data by website data collectors. 684 F. Supp. 3d at 1037.

Thus, the Website's spyware alleged in the FAC qualifies as "device or process" within the meaning of subdivision (c) of section 638.50 of the Penal Code because it constitutes "software that identifies consumers, gathers, data, and correlates that data." *Greenley*, 684 F. Supp. 3d at 1050.

In addition, the Website's software is a "device" because "in order for software to work, it must be run on some kind of computing device. It is artificial to claim that software must be viewed in isolation from the computing device on which it runs and with which it is inseparable in regard to the challenged conduct." *James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 958 (N.D. Cal. 2023).

**a. The IP Addresses Collected by the Website's Spyware Qualify as "Addressing Information."**

In *Mirmalek*, *supra*, the federal court stated:

> "As the Ninth Circuit held, 'IP addresses 'constitute addressing information and do not necessarily reveal any more about the underlying contents of communication than do phone numbers.''"

*Mirmalek*, 2024 WL 5102709, at *4 (quoting *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014) (quoting *Forrester*, 512 F.3d at 510); *see also Shah*, 754 F. Supp. 3d at 929 (holding that "the IP addresses collected by the Trackers fall within the statutory definition of 'addressing' information.") (citing *In re Zynga Privacy Litig.*, 750 F.3d at 1108); *see also Lesh*, 2025 WL 563358, at *4 ("the IP addresses collected by the Trackers qualify as 'addressing information' under the statute [Penal Code § 638.50]"). In *Lesh*, the federal court noted, "An IP address contains information related to geographical location of a device's state, city, and zip code." *Id.*

The FAC alleges that the Website's spyware on the Website collected the IP address of Plaintiff's device.[13] (FAC ¶ 63.) Thus, the collection of the IP address of Plaintiff's

[13] The collection of the IP addresses of users' devices that visit the Website does not itself constitute the content of user communications. *In re Zynga Priv. Litig.*, 750 F.3d at 1108 ("IP addresses 'constitute addressing information and do not necessarily reveal any more about the underlying contents of communication than do phone numbers.'") (quotation omitted).

device constitutes "addressing" information within the meaning of section 638.50(b) and (c).

**b. IP Addresses Are "Transmitted by an Instrument or Facility From Which a Wire or Electronic Communication Is Transmitted."**

As *Lesh* recognized, "IP addresses are 'transmitted by an instrument or facility from which a wire or electronic communication is transmitted.'" *Lesh*, 2025 WL 563358, at *4 (quoting Penal Code § 638.50); *see also Shah*, 754 F. Supp. 3d at 928-29. As *Lesh* explained:

> "When a user first visits the Website, the browser sends an 'HTTP request' to CNN's server, which then responds with instructions that install the Trackers. Such Trackers prompt the browser to send the user's IP address. These facts adequately allege the transmission of an electronic communication."

*Lesh*, 2025 WL 563358, at *4. Notably, *Lesh* rejected construing section 638.50 as narrowly limited to only the capture of telephone information. *Id.* In referencing subdivision (b) of section 638.50, *Lesh* noted:

> "***The statutory text includes no limitation to information transmitted by telephone or over a phone line. Nor does such a narrow limitation comport with CIPA's purpose.*** CIPA was passed, in part, because 'the development of new devices and techniques for the purpose of eavesdropping upon private communications ... has created a serious threat to the free exercise of personal liberties.' Cal. Penal Code § 630. Consistent with this legislative intent, the definition of pen register in CIPA encompasses a variety of 'electronic communications.'"

*Id.* (emphasis added). Although *Lesh* considered section 638.52, which referenced terms like "telephone number" and "telephone line," *Lesh* found that "this language is insufficient to support a reading of 'telephone' into the definition of 'pen register.'" *Id.* *Lesh* explained:

> "Section 638.52 lists requirements authorizing a warrant for a pen register on a telephone line but does not redefine 'pen register' in Section 638.50. Section 638.52 'merely lists requirements relating to a particular type of pen register: one that is installed on a telephone line' but does not otherwise 'alter the statutory definition of a pen register stated in § 63[8].50(b)'. *Shah*, 2024 WL 4539577, at *4. The Court will not read the term 'telephone' into Section 638.50 just because the word is used in another section of the statute that bears little relevance here."

*Id.*; *Shah*, 754 F. Supp. 3d at 930 ("Section 638.52, however, merely lists requirements relating to a particular type of pen register: one that is installed on a telephone line.").[14] *Lesh* concluded, "In short, the plain text of Section 638.50 clearly does not limit the application of pen registers to telephones." *Lesh*, 2025 WL 563358, at *5. *Lesh* is persuasive. *See also Riganian*, 2025 WL 2021802, at *11 ("if the drafters of Section 638.50 intended for 'pen register' to be limited to telephone technologies, they knew how to say so") and *Motorola*, 2025 WL 1939957, at *11 (same).

"When an individual internet user visits a web page, his or her browser sends a message called a 'GET request' to the web page's server. The GET request serves two purposes: it first tells the website what information is being requested ***and then instructs the website to send the information back to the user***. The GET request also transmits a refer[r]er header containing the personally-identifiable URL information. Typically, this communication occurs only between the user's web browser and the third-party website." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 607 (emphasis added). Thus, when a user first visits the Website, the user's browser sends an "HTTP request" or a "GET request" to Defendant's Website server, which then responds with instructions that install the trap and trace device, which prompts the user's browser to send the user's IP

[14] As mentioned above, California's provisions must track the minimum requirements of the federal provisions in order for California's statutory scheme to avoid being preempted by the federal provisions. Thus, if California's Legislature enacted "less restrictive legislation" than the Patriot Act, then California's legislation violated the federal floor established by the federal Pen Register Act (enacted via the federal ECPA), as amended by the Patriot Act.

address. The fact that the FAC alleges that the Website is functional shows that the Website transmitted an electronic communication back to Plaintiffs' computer devices with instructions on how to load the Website's webpages. "These facts adequately allege the transmission of an electronic communication." *Lesh*, 2025 WL 563358, at *4.

**c. The Case Law Supporting Plaintiff's Position Is Both Comprehensive and Persuasive.**

Notably, *Greenley*'s conclusion that tracking software could plausibly constitute a pen register under §§ 638.50 and 638.51 has been cited with approval by at least eight recent federal court decisions. *Haleon*, 2025 WL 2494368, at *11; *Riganian*, 2025 WL 2021802, at *11-*12; *Motorola*, 2025 WL 1939957, at *11-*12; *Conohan*, 2025 WL 1111246, at *6; *Lesh*, 2025 WL 563358, at *3; *Zarif*, 2025 WL 486317, at *12; *Autotrader.com*, 762 F. Supp. 3d at 929; *Mirmalek*, 2024 WL 5102709, at *3; *Shah*, 754 F. Supp. 3d at 931 ("Based on the expansive statutory definition of a pen register, 'tracking software could plausibly constitute a pen register under §§ 638.50 and 638.51.'") (quoting *Moody*, 742 F. Supp. 3d at 1076 (citing *Greenley*, 684 F. Supp. 3d at 1050)). *Shah* explained, "Giving effect to CIPA's broad statutory language is consistent with the California Legislature's stated intent to protect privacy interests, as well as the California courts' approach when applying statutes to new technologies." 754 F. Supp. 3d at 930 (citing cases).

**d. The Argument that Section 638.51 of the Penal Code Should Be Interpreted to Exclude Defendant's Cookies Because Such Cookies Copy the Content of the Communications Between the Website and Plaintiff and Other Users Is Wrong.**

Plaintiff anticipates that Defendant shall argue in its Reply that Plaintiff's cause of action predicated upon a violation of section 638.51 of the Penal Code cannot state a viable cause of action because: (1) the statutory definition of both "pen register" and "trap and trace device" exclude the "contents of a communication," in section 638.50(b) & (c) of the Penal Code; and (2) the FAC implies that such contents of a communication were

recorded. Such precise argument has been expressly rejected by at least two federal district courts recently.

In *In re Meta Pixel Tax Filing Cases*, *supra*, the court rejected precisely the same argument in the defendant's motion to dismiss. 2025 WL 2243615, at *4-*6. After initially finding ambiguity in the relevant statutory language, *id.* at *4, the court then comprehensively analyzed the Legislature's intent. In this regard, the court stated:

> "Given CIPA's purpose to protect Californians' privacy, it is highly unlikely that the Legislature intended to permit the installation and use of pen registers so long as those devices also record the contents of a third party's communications. Under Meta's interpretation of the statute, an entity could escape liability under CIPA's pen register provisions by combining the functionality of a wiretap with that of a pen register. That entity could also escape liability under CIPA's wiretap provisions by utilizing only the information tracked by pen registers and not 'read[ing], or attempt[ing] to read ... the contents' of communication. Cal. Penal Code § 631(a). Such an entity could engage in the very conduct that CIPA proscribes—using a pen register without a court order—while escaping liability through a statutory loophole that is available only because that entity collects even more sensitive information (the content of Californians' communications) along with the information recorded by pen registers. In contravention of the California Legislature's intent in enacting CIPA, Meta's proposed loophole would allow any entity to avoid CIPA's pen register provisions simply by employing more intrusive forms of technology."

*Id.* at *5. The court added:

> "Meta's argument [that the statute was in fact intended to operate in this precise manner], however, would effectively render Section 638.51(b)'s telecom exception superfluous. If Meta is correct that any entity can install a pen register that also collects the contents of communication without facing liability under CIPA's pen register provisions, why would Section 638.51(b) exist at all? A telecom could install a pen register to collect metadata for the purposes clearly enumerated within

subsection (b)—such as to protect its own rights or property—but if it were also using that device to collect the contents of communications, Section 638.51(a)'s court order requirement would not apply and there would be no need for an exception. More troubling still, a telecom could install a pen register to collect data for purposes that do not fall within subsection (b)'s enumerated exceptions—such as for advertising purposes—but if that same entity also used the device to record the content on its customers phone calls, the telecom could install the pen register without the court order required by Section 638.51(a)."

*Id.* at *5. The court added:

"Although Meta expresses concern about an authorized pen register masquerading as a shadow wiretap, its argument would allow an *unauthorized* pen register to circumvent judicial oversight so long as that device included a modicum of nonessential wiretapping technology. Because recognizing such a loophole would significantly limit the privacy protections offered by CIPA's pen register provisions, it is unsurprising that courts regularly allow both wiretap and pen register claims to proceed. *See Zarif v. Hwareh.com, Inc.*, 23-cv-0565-BAS-DEB, —— F.Supp.3d ——, 2025 WL 486317 (S.D. Cal. Feb. 13, 2025); *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024 (S.D. Cal. 2023); *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072 (C.D. Cal. 2024). Given CIPA's purpose to protect Californians against the privacy intrusions that can result from either wiretaps or pen registers, the better interpretation of Section 638.51 is that it defines a pen register as any device that 'records dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted,' but not a device that records only 'the contents of communications.' Under this construction of the statute, Meta's argument that plaintiffs fail to plead its use of a pen register without a warrant fails."

*Id.* at *5 (emphasis in original). The court added:

> "In any event, even assuming Meta were correct that CIPA precludes a single device from being both a wiretap and a pen register, its motion would still fail. The complaint alleges that the Pixel is a 'small library of functions' with an array of capabilities that allows the website owner to do a variety of things. SAC ¶27. One of those functions collects data such as 'HTTP Headers' and IP addresses, while a different function collects the contents of users' communications. If the various functionalities within the Meta Pixel operate independently from one another, as plaintiffs plausibly allege, the process that records metadata in a pen register-like manner is a separate 'device' or 'process' from the one that collects the contents of users' communications. Under Section 638.51, plaintiffs are entitled to pursue a claim against Meta for its use of the pen register 'device without a warrant whether or not Meta has also installed or used a separate wiretap device to record and review the contents of users' communications."

*Id.* at *6. The court's analysis in *In re Meta Pixel Tax Filing Cases* is persuasive.

Indeed, in *Haleon*, the federal district court agreed with *In re Meta Pixel Tax Filing Cases* as persuasive. *Haleon* explained:

> "Haleon also asserts, in passing, that Gabrielli's Section 638.[5]1(a) pen register claim cannot coexist with his Section 631(a) wiretapping claim because pen registers 'do not record contents,' but wiretaps do. It says Gabrielli 'cannot have it both ways'; from its perspective, he can either claim that cookies captured the 'contents' of his communications, giving rise to his Section 631(a) claim, or he can claim that the cookies are unauthorized pen registers, which 'by definition do not capture 'contents' ', to support his Section 638.[5]1(a) claim. This argument would lead to the conclusion that any pen register that also recorded the 'contents' of users' information would no longer fall under the protection of Section 638.[5]1(a) of CIPA. That cannot have been the Legislature's intent."

2025 WL 2494368, at *12 (internal citations omitted). *Haleon* added:

> "The Hon. Casey Pitts recently considered and rejected a similar argument, noting

> the statutory ambiguity concerning whether devices that would otherwise constitute pen registers still fall under the section 638.[5]1(a) pen register CIPA provision if they capture 'contents' of web users' communications as well as simply recording or decoding those communications."

*Id.* at *12 (citing *In re Meta Pixel Tax Filing Cases*, 2025 WL 2243615, at *4-*5). *Haleon* added:

> "I agree with Judge Pitts that given CIPA's purpose to protect Californians' privacy, it seems very unlikely that the state Legislature meant to permit the installation and implementation of pen registers 'so long as those devices also record the contents of third party's communications.'"

*Id.* at *12.

**4. Defendant Is Not an Electronic Communication Service Provider.**

Although Defendant contends that it is an electronic communication service ("ECS") provider under Penal Code § 638.51(b)(1), such argument is without merit. *Mirmalek*, 2024 WL 5102709, at *5 ("Defendant fails to establish that it is a 'provider of electronic or wire communication service.'"). Federal courts have rejected construing an ECS broadly to cover merely "sending information to servers" "because it would expand 'electronic communication service' to ***all online services*** and thus render the term meaningless." *Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 687 (N.D. Cal. 2021) (emphasis added); *Cottle v. Plaid Inc.*, 536 F. Supp. 3d 461, 490 (N.D. Cal. 2021) ("The fact that an entity communicates electronically with its customers does not mean that it 'provides an [ECS]'").

**5. Defendant's Consent Is Insufficient.**

Defendant has failed to satisfy its burden of proving consent as a matter of law.[15] Defendant's argument that its own consent counts so as to trigger the section 638.51(b)(1) exception finds no support in the statutory text, and is "illogical." *Lesh*, 2025 WL 563358,

[15] Defendant has the burden to prove consent. *Calhoun v. Google, LLC*, 113 F.4th 1141, 1147 (9th Cir. 2024).

at *5 (rejecting defendant's argument that consent to use Trackers was obtained from one party to communication, *i.e.*, itself as "self-serving"); *Moody*, 742 F. Supp. 3d at 1077.

**6. Section 638.51 Provides a Private Right of Action.**

As *Moody* stated, "§ 637.2 expressly states that all CIPA violations, including § 638.51, confer a private right of action." *Moody*, 2024 WL 3561367, at *4. Section 638.51 is part of the same "chapter" as section 637.2 (*i.e.*, Chapter 1.5). Thus, violations of § 638.51 may be redressed through a private claim.

Although Defendant purports to rely on the common law rule of lenity, (Def.'s Mem. at 27:19-22), it does not apply to the question whether violations of section 638.51 confer a private right of action. Based on Penal Code § 4, "although true ambiguities are resolved in a defendant's favor, ***an appellate court should not strain to interpret a penal statute in defendant's favor if it can fairly discern a contrary legislative intent***." *People v. Avery*, 27 Cal.4th 49, 58 (2002) (emphasis added) ("The rule [of lenity] applies only if the court can do no more than ***guess*** what the legislative body intended; there must be an egregious ambiguity and uncertainty to justify invoking the rule.") (emphasis added). "In other words, 'the rule of lenity is a tie-breaking principle, of relevance when ' 'two reasonable interpretations of the same provision stand in relative equipoise ....' ' ' " *People v. Braden*, 14 Cal.5th 791, 824 (2023). Plaintiff submits that a contrary legislative intent can be "fairly discern[ed]" here. This Court can do far more than "guess" what the Legislature intended to create a private right of action by placing section 638.51 in the same "chapter" as section 637.2. The parties' positions are not in "relative equipoise."

**C. The FAC Sufficiently Alleges a Violation of Section 631(a) of the Penal Code.**

Defendant's violation of section 631(a) of the Penal Code is plausibly alleged. *Haleon*, 2025 WL 2494368, at *10-*11; *Riganian*, 2025 WL 2021802, at *10-*11; *Motorola*, 2025 WL 1939957, at *10-*11; *Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023). Section 631(a) imposes no confidentiality requirement. *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *3 n.3 (N.D. Cal. Oct. 23, 2019) (citing *People v. Guzman*, 11 Cal. App. 5th 184, 192 n.7 (2017)).

Although Defendant assumes that the fourth clause of section 631(a) imposes an "aid and abet" legal standard, (Def.'s Mem. at 9:5-27; 16:8-24), the fourth clause omits the word "abet" so it does not impose an "aid and abet" requirement under California criminal law. *Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117, 1130 (S.D. Cal. 2023)("Defendant's contention that 'aids' means 'aiding and abetting' ignores the 'agrees with, employs, or conspires with' language of the clause. Defendant provides no case law requiring the Court to analyze 'aids, agrees with, employs, or conspires with' as solely 'aiding and abetting.'").

**D. The Prayer for Punitive Damages Should Not Be Stricken.**

The FAC alleges sufficient facts to trigger punitive damages. And, the Ninth Circuit has held that "Rule 12(f) does not authorize a district court to dismiss a claim for damages on the basis it is precluded as a matter of law." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 976 (9th Cir. 2010).

Dated: September 29, 2025

PACIFIC TRIAL ATTORNEYS, P.C.

By: */s/ Scott J. Ferrell*

Scott. J. Ferrell
Attorney for Plaintiff

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiff, certifies that this brief contains 9,500 words, which complies with the 9,500 word limit set forth in this Court's (In Chambers) Order Re: Further Proceedings. (Doc. 30.)

Dated: September 29, 2025

*/s/ Scott J. Ferrell*
Scott J. Ferrell